641 F.2d 1262
 7 Bankr.Ct.Dec. 694
 In re T. R. AXTON, Sr., Corporation d/b/a Hollandease
Restaurant, a California
Corporation, Debtor. NORTHWESTERN MUTUAL LIFE INSURANCE
COMPANY, a Wisconsin Corporation, Plaintiff-Appellee,
v.
T. R. AXTON, Sr., Corporation, d/b/a Hollandease Restaurant,
a California corporation, Carlyle Michelman,
Receiver, Defendant-Appellant.
 No. 77-3801.
 United States Court of Appeals,
Ninth Circuit.
 Submitted Sept. 7, 1979.
Decided March 16, 1981.
 
 1
 Joel Mithers, Los Angeles, Cal., for defendant-appellant.
 
 
 2
 William A. Halama, Los Angeles, Cal., for plaintiff-appellee.
 
 
 3
 Appeal from the United States District Court for the Central District of California.
 
 
 4
 Before WRIGHT and WALLACE, Circuit Judges, and HOFFMAN, Senior District Judge.*
 
 HOFFMAN, Senior District Judge:
 
 5
 This is an appeal by the receiver and debtor-in-possession from an order of the district court affirming an order of the bankruptcy judge in a Chapter XI proceeding sustaining a motion for summary judgment in favor of Northwestern Mutual Life Insurance Company and dismissing the appellants' cross-claims for lack of jurisdiction.
 
 
 6
 The debtor, T. R. Axton, Sr., Corporation d/b/a Hollandease Restaurant, a California corporation, operated a restaurant at One Wilshire Boulevard, Los Angeles, California and, on some date prior to July 30, 1971, filed a Chapter XI arrangement proceeding.[1] Carlyle Michelman was appointed receiver. The original owners of One Wilshire Boulevard, namely, One Wilshire Company (later One Wilshire Financial Corp.), entered into a lease with the debtor's predecessors on September 9, 1966. The lease is not a part of the record on appeal and was not designated as such by the parties. However, from the briefs and uncontroverted statements contained in the papers, we are able to ascertain the pertinent provisions.
 
 
 7
 After the Chapter XI proceeding was filed, a controversy developed as to whether the then owner, One Wilshire Financial Corp., was entitled to the possession of its premises. By stipulation and order of the bankruptcy court, filed July 30, 1971, the owner, the debtor and its receiver agreed that the receiver could remain in possession upon the payment of specific sums through August 31, 1971, and beginning September 1, 1971 at a rate of $3352 per month, plus any amounts due under the percentage lease of 1966. The agreement further provided that the receiver would pay the additional sum of $1500 per month until the rental delinquencies due by debtor to owner, plus attorneys' fees, had been extinguished, reserving to any trustee in bankruptcy the right to claim such additional payments as voidable preferences. The stipulation stated that, if the agreed payments were not made, the receiver would surrender possession of the premises with a resulting dissolution of the temporary restraining order previously issued by the bankruptcy court. It further provided that the receiver would be liable for all rent accruing under said agreement during the time he had actual possession of the premises and the debtor would be liable for all delinquent rent owing as of July 30, 1971.
 
 
 8
 On September 30, 1976, the Northwestern Mutual Life Insurance Company, having acquired title to the property along with the lessor's interest in the 1966 lease and the stipulation and order of July 30, 1971, filed a document in the Chapter XI proceeding entitled "Complaint for Termination of Lease and Damages", alleging the foregoing facts and that neither the receiver nor debtor had paid any monthly installments of rent for any month in 1976, except the payment for the month of May, and the installment payments then due aggregated $26,816.00.[2] Additionally, Northwestern claimed, but did not seek judgment for, unspecified amounts due for tax escalations, operating escalations and other amounts for 1976 and prior years. The complaint alleged, as required by California law, that a three-day notice had been given to the receiver and debtor in possession stating the rent then due and requiring payment or possession of the premises within three days after service of the notice. The prayer for relief sought an order restoring possession of the premises, the sum of $26,816 for rent due "and for such further sums as may accrue to the rendition of judgment herein with interest thereon at the rate of 7% per annum", reasonable attorneys' fees and costs, a forfeiture of the lease, and a declaration that neither the receiver nor debtor is entitled to or has any right, title or interest in the premises.
 
 
 9
 The receiver answered the complaint and filed a cross-claim.[3] Claiming that the owner breached the terms of the 1966 lease which allegedly excused the receiver from making payment of rent, the cross-claim asserts:
 
 
 10
 (1) That a 1975 fire in the adjacent premises caused water damage to the restaurant premises requiring an expenditure of $29,000 which, although wholly or partially covered by the receiver's insurance carrier, remained an obligation of the owner to reimburse.
 
 
 11
 (2) That a pipe in the upstairs portion of the building broke in the spring of 1976, causing extensive water damage and necessary repairs and replacements, with no reimbursement by the owner.
 
 
 12
 (3) That by reason of the water damage mentioned in (2) above, the restaurant became infested with roaches and mice.
 
 
 13
 (4) The owner did extensive remodeling of the exterior of the premises, including the destruction of hardwood exterior placed thereon by the receiver or debtor at an expenditure of $6,000 and the remodeling operation interfered with the access of patrons.
 
 
 14
 (5) The owner has closed the doors of the restaurant, interfered and impeded traffic to the restaurant, and turned out the lights to the corridor between 6:30 and 7:00 in the evenings.
 
 
 15
 (6) The owner has sold the adjacent parking lot, thus denying the receiver and debtor access for the delivery of food and other supplies, thereby requiring deliveries at 3:30 or 4:00 A.M.
 
 
 16
 (7) That the actions of the owner have destroyed the receiver's operations to the extent of $7,000 per week.
 
 
 17
 The receiver requested a temporary restraining order, damages for loss of revenue in the sum of $280,000, reimbursement of $29,000 for water damage from the fire of the adjacent premises, reimbursement for water damage by reason of the broken pipe, and damages for loss of access for delivery of supplies.
 
 
 18
 Northwestern initially filed a motion to dismiss the counterclaims and cross-claim, as well as a motion to strike affirmative defenses. A few weeks later, Northwestern filed a motion for summary judgment.
 
 
 19
 When the matter was heard before the bankruptcy judge on January 21, 1977, the facts had been essentially resolved. The debtor and receiver were still in possession of the premises; it was conceded that neither paid any rent during 1976, except for the month of May. The bankruptcy court determined the eleven months' use and occupancy allowance at $36,872. The bankruptcy court, assuming as true for the purpose of the motion for summary judgment the facts pleaded by the debtor and receiver, found that the alleged breaches by Northwestern violated only the covenant of quiet enjoyment implied under the lease. Then follows the bankruptcy court's conclusions of law:
 
 
 20
 "3. The lessor's covenant of quiet enjoyment implied under the Lease is independent of the lessee's obligation to pay rent and a breach of the covenant of quiet enjoyment by the lessor does not excuse the lessee's obligation to pay rent.
 
 
 21
 "4. The court does not have summary jurisdiction over the matters asserted in the cross-claims filed by the debtor and receiver because the cross-claim is a claim for damages and does not involve a claim to property in the actual or constructive possession of the court nor has plaintiff (Northwestern) filed a proof of claim or undertaken any other act which constitutes a consent to the summary jurisdiction of this Court."
 
 
 22
 The issues presented by this appeal are as follows:
 
 
 23
 I. Under California law, in a commercial lease is the covenant to pay rent independent of the landlord's obligations to the extent that, if a tenant is dissatisfied with the condition of the premises, the tenant can refuse to pay rent and continue to occupy the premises?
 
 
 24
 II. In light of the written stipulation filed in the bankruptcy proceedings, is the relationship between the parties contractual or governed by a different set of rules?
 
 
 25
 III. Has Northwestern consented to the summary jurisdiction of the bankruptcy court by filing its complaint seeking the forfeiture of the lease and monetary damages?
 
 
 26
 IV. Is the lessee's claim for damages under the stipulation and agreement a compulsory cross-claim to a claim by lessor under said stipulation and agreement?
 
 I.
 
 27
 Appellant contends that the "Middle Ages" rule with respect to independent covenants in leases is outmoded and has been repudiated by the California Supreme Court. Reliance is placed upon Green v. Superior Court, 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974); Hinson v. Delis, 26 Cal.App.3d 62, 102 Cal.Rptr. 661 (1972); and Medico-Dental Co. v. Horton & Converse, 21 Cal.2d 411, 132 P.2d 457 (1942). Green and Hinson refer to residential properties having an implied covenant of habitability, with major violations of building codes which affected habitability.[4] Medico-Dental concerned a rental covenant together with an express covenant not to lease to a competitive business which, when violated by the landlord, justified an offset to the obligation to pay rent.[5]
 
 
 28
 Appellee urges that Petroleum Collections Incorporated v. Swords, 48 Cal.App.3d 841, 122 Cal.Rptr. 114 (1975), is controlling. Appellant makes no mention of this case in its brief. Texaco leased to Swords a service station and a large "Modular" type elevated sign visible from Freeway 99. After the lease was signed and Swords took possession, the building inspector ordered that the sign be removed or altered as constituting a hazard. Texaco caused the sign to be removed and replaced it with an antiquated sign not visible from Freeway 99. Swords insisted upon a visible sign. Texaco failed to comply and Swords refused to pay the rent, although he remained in possession for a period of 11 months after the sign was removed. The action was by Texaco's collection agency. The Court of Appeal, Fifth District, in reversing the trial court, held that the removal of the sign was a breach of the landlord's covenant of quiet enjoyment but that the implied covenant of quiet enjoyment and the express covenant to pay rent were independent[6] and, as long as the tenant occupied the service station, the tenant had to pay rent.[7]
 
 
 29
 We are unable to distinguish the Swords case from the factual situation here presented. We agree with the bankruptcy judge that the obligation to pay for the use and occupancy of the premises continued as long as the debtor or receiver remained in possession until modified by court order. It should be noted that appellant makes no issue as to the sum of $40,224 which the bankruptcy judge found to be due, same constituting the 11 months in 1976 and two months in 1977. Moreover, the bankruptcy court did not enter a monetary judgment for that amount; it merely provided for forfeiture of the lease, ordering the debtor and receiver to vacate the premises, and granting possession to Northwestern unless the sum of $40,244 was paid on or before February 28, 1977. The money was not paid.
 
 II.
 
 30
 Neither party cites any authority for the proposition advanced by appellant that Northwestern's cause of action is predicated upon the stipulation and not the lease. It should be noted, however, that appellee refers to a provision in the stipulation which states: "Neither lessor nor lessee are waiving any of their respective rights under the aforesaid lease". In our judgment, the lease and stipulation must be read together and the rule of independent covenants would apply.
 
 
 31
 In the case of In re Wil-low Cafeterias, Inc., 111 F.2d 83 (2d Cir. 1949), a reorganization proceeding under § 77B of the Bankruptcy Act (the predecessor to a Chapter XI proceeding), there was a lease between the landlord and debtor existing at the time of the filing of the petition under § 77B. By agreement between the debtor-in-possession and the landlord approved by the court, the rental was modified and certain other conditions specified. The issue before the Second Circuit was whether this agreement constituted a new lease or a mere modification of the old lease and an adoption of the latter as modified. The appellate court held that the old lease, as modified and approved by the court, remained in effect.
 
 
 32
 This authority supports appellee's argument that the rule of independent covenants would apply.
 
 
 33
 III. and IV.
 
 
 34
 It is conceded that Northwestern never filed a claim in this Chapter XI proceeding. It is also apparent that, at all times, Northwestern objected to the summary jurisdiction of the bankruptcy court as to the cross-claim. Appellant urges, however, that the filing of the complaint seeking forfeiture of the lease and monetary damages is tantamount to consent for summary jurisdiction of the bankruptcy court, citing Peters v. Lines, 275 F.2d 919 (9th Cir. 1960). The law is well settled that a creditor consents to summary jurisdiction by filing a proof of claim, but that is not the situation here.
 
 
 35
 The complaint filed by Northwestern did not seek monetary damages as that name suggests. It did seek judgment in the sum of $26,816 for rent due and unpaid during the Chapter XI proceeding pursuant to the stipulation and order entered by the bankruptcy court on July 30, 1971, plus such further sums as may accrue prior to the rendition of judgment. While the complaint referred to other sums allegedly due by reason of tax escalations, operating escalations, and "other amounts for 1976 and prior years", no judgment was sought for these items in the prayer for relief and, as to these items, the complaint stated, "By commencing the within proceedings, plaintiff (Northwestern) does not waive its right to collect such amounts at a later time or to evict the defendants (debtor and receiver) based upon such defaults." And, as noted above, the bankruptcy court did not award a monetary judgment, although it conditioned its forfeiture on the non-payment of $40,244 by February 28, 1977.
 
 
 36
 Northwestern's action in the bankruptcy court is one seeking determination of an administrative expense for rent accrued during the course of the Chapter XI proceeding, a rental arrangement which had the prior approval of the bankruptcy court.
 
 
 37
 While we do not have before us the entire bankruptcy record, we must assume that the Chapter XI proceeding was filed on some day prior to July 30, 1971. Bankruptcy Rule 11-44 became effective July 1, 1974, but, even if not in effect when the petition was filed, the provisions of 11 U.S.C. §§ 711 and 714 were in effect as early as 1938. These are the "stay" provisions of a Chapter XI proceeding and Rule 11-44 merely supplements and reinforces the prior statutes and now provides for an automatic stay of proceedings against the debtor. Thus, when the debtor's payments to Northwestern became in default, it was necessary for Northwestern to seek relief under Rule 11-44(d). The Advisory Committee's note states that a creditor who is subject to the stay of this rule may obtain relief therefrom in appropriate cases by filing a complaint in the court pursuant to subdivision (d); thereafter, the proceedings are governed by Part VII of the Bankruptcy Rules. Part VII relates to adversary proceedings. Reverting to Part VII we find a reference to proceedings instituted by counterclaims by trustees for money or property from creditors who have filed claims. See: Rule 306(c). Rule 712(b) makes applicable subdivisions (b)-(h) of Rule 12, F.R.P.C., in an adversary proceeding, except that: "an objection to the jurisdiction of the court of bankruptcy is governed by Rule 915." The latter rule, Rule 915(a), merely provides that a party waives objection to jurisdiction of an adversary proceeding or a contested matter and thereby consents to such jurisdiction if he does not make objection by a timely motion or answer, subject, however, to Rule 928. Looking to Rule 928, we find: "These rules shall not be construed to extend or limit the jurisdiction of courts of bankruptcy over subject matter."
 
 
 38
 Thus, since Northwestern never filed a claim but only proceeded in an adversary proceeding and, in light of Rule 928, jurisdiction cannot be asserted over the subject matter of the cross-claim (or counterclaim), and Northwestern at all times objected to the jurisdiction of the bankruptcy court as to the cross-claim, the mere filing of a complaint by way of an adversary proceeding is not tantamount to consent to summary jurisdiction as to the subject matter of the cross-claim. For these reasons, Peters v. Lines, 275 F.2d 919 (9th Cir. 1960), the only authority relied upon by appellant herein, is inapposite. Peters was decided prior to the promulgation of the Bankruptcy Rules and, as stated, dealt with a proof of claim filed by a creditor to which there was an objection interposed by the trustee in bankruptcy.
 
 
 39
 There is no apparent dispute that the mere filing of the complaint by Northwestern to vacate the automatic stay previously ordered was not a "claim" which would be interpreted as subjecting Northwestern to the summary jurisdiction of the bankruptcy court. The authorities support the view that a person may file such an action and still not consent to summary jurisdiction. It was so held in Matter of Roloff, 598 F.2d 783 (3rd Cir. 1979), where certain secured creditors in a Chapter XII proceeding sought relief from the automatic stay as provided in Bankruptcy Rule 12-43(a), and the debtors filed an affirmative defense and counterclaim, the former grounded on estoppel and the latter attacking the secured creditor's right to foreclose on the property. In affirming the district court which had reversed the bankruptcy judge, the Third Circuit relied heavily upon In re Essex Properties, Ltd., 430 F.Supp. 1112 (N.D.Cal.1977), in which the secured creditor had commenced a real property foreclosure action in a Florida State court. The debtor in Essex filed a Chapter XII proceeding, thereby staying continuation of the foreclosure suit. In response to the creditor's complaint for relief from stay, the debtor answered, raising certain affirmative defenses and counterclaims, including usury, negligence, breach of contract and fraud. The creditor moved to strike the affirmative defenses and to dismiss the counterclaims, and this motion was granted by the bankruptcy judge. On review by the district court, the order was affirmed and, in the opinion of the Third Circuit, correctly so.
 
 
 40
 This circuit has held along similar lines in PIC Realty Corp. v. Evans, 605 F.2d 476 (9th Cir. 1979), in an opinion by Judge Sneed. The creditor PIC, came into the bankruptcy court in a Chapter XI proceeding to lift the automatic stay over legal actions against the debtor, Vita Management Company. PIC also asked for administrative rental for the period in which Vita Management possessed the hotel during the pendency of the Chapter XI proceeding. The rentals, as in the present case, were not claimed under the lease, which had been terminated, but for the use and occupancy of the premises during the time it was possessed by the bankruptcy court. While little was said as to whether the request for administrative rental constituted a "claim," the court did note that "The very action of entering the bankruptcy court conveys consent as to the transaction. But this consent does not extend to 'totally unrelated counterclaims.' " Later, the PIC court said: "PIC was not even presenting a claim to the bankruptcy court. It was, however, asking that court to recognize the termination of its lease agreement with the Vita interests. In so doing, PIC consented to the adjudication of counterclaims relating to that lease."[8] The principal distinctions between PIC and the matter now before the court are (1) in PIC the lease had terminated by reason of the filing of the petition for arrangement; in the present case the lease was still in existence as modified by Court order; (2) the nature of the counterclaims in PIC were to declare null and void a settlement effected three and one-half months prior to the filing of the Chapter XI proceedings with a resulting transfer of title to PIC; in the instant proceeding the debtor and receiver allege, by way of a cross-claim, an action for damages for allegedly breaching the lease agreement and for tort; (3) no prior order allowing administrative rental was entered by the bankruptcy court in PIC; the contrary is true in the matter now before the court. The PIC court warns against the trend to permit summary disposition of bankruptcy matters, citing Suhl v. Bumb, 348 F.2d 869, 871 (9th Cir.), cert. denied, 382 U.S. 938, 86 S.Ct. 388; 15 L.Ed.2d 349 (1965), and concluded:
 
 
 41
 We must keep in mind the tension between the need to fashion broad remedies to revive the debtor and the need to protect the interests of third parties by preserving their rights to plenary proceedings.
 
 
 42
 In Henkin v. United States, 229 F.2d 895 (2nd Cir. 1956), a contention was advanced by the trustee in bankruptcy that the United States, as holder of a tax lien, had submitted to the summary jurisdiction of the bankruptcy court by filing a motion to vacate the stay order previously granted to prevent a scheduled sale of assets pursuant to a seizure under warrants for distraint. The Second Circuit, relying upon Cline v. Kaplan, 323 U.S. 97, 99, 65 S.Ct. 155, 156, 89 L.Ed. 97 (1944), held that there was no consent to summary jurisdiction.
 
 
 43
 In the controversy now before the court there is no suggestion that the debtor or receiver ever presented to the bankruptcy court, or to any other court, prior to the filing of the cross-claim any of seven matters stated in said document; nor is it even alleged that any demand was made upon Northwestern, informally or otherwise. Aside from this fact, Northwestern's "Complaint for Termination of Lease and Damages" did not bring into issue any covenant under the lease, but merely requested the termination of any existing agreement with respect to the use and occupancy of the premises by reason of the debtors serious default in payments as required by order of the bankruptcy court, together with a request for payment of the accrued payments due under said court order, but expressly eliminating any claim for payments due prior to the entry of the court order or for any failure to pay any sums due by reason of delinquencies existing at the time of or since the entry of the order.
 
 
 44
 As we view the situation, allowing a debtor to raise such claims as fraud, negligence, breach of contract, usury, interference with prospective business advantage, securities fraud, antitrust violations and other related matters by way of counterclaims to a complaint to terminate an automatic stay whether the claims are real or imagined would flood the bankruptcy courts with complex trials including jury trials on every conceivable tort and contract counterclaim. The essential nature of a stay is akin to a hearing on a preliminary injunction. In re Decker, 465 F.2d 294, 297 (3rd Cir. 1972), and is entitled to a calendar priority, Bankruptcy Rule 11-44(d). Thus, seeking relief from a stay order is defensive in character and tantamount to a motion to dissolve a preliminary injunction. The result in allowing such counterclaims would present "nightmares of complexity."[9]
 
 
 45
 An exhaustive article by Peitzman and Smith entitled "The Secured Creditor's Complaint: Relief from the Automatic Stays in Bankruptcy Proceedings", 65 Cal.L.Rev. 1216, with particular reference to pages 1243-1251, discusses the problem at length. While the article refers essentially to the rights of secured creditors, it points out the related problem pertaining to bankruptcy termination clauses in leases, and mentions In re D. H. Overmyer Co., 510 F.2d 329 (2nd Cir. 1975), holding that the district court in a Chapter XI proceeding did not abuse its discretion by terminating the lease where the debtor had a pattern of poor relationships with the landlords, where there was no prospect for future improvement, and where, with respect to some leases, there were serious defaults in the payment of rent.
 
 
 46
 While agreeing that the new Bankruptcy Act, P.L. 95-598, November 6, 1978, 92 Stat. 2549, effective October 1, 1979, is not applicable to this case, we think that the treatment of automatic stays under the new Act may serve to clarify the confusion which has heretofore existed. Under 11 U.S.C. § 362(d) of the new Act, it is said:
 
 
 47
 On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as terminating, annulling, modifying, or conditioning such stay
 
 
 48
 (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
 
 
 49
 (2) with respect to a stay of an act against property; if
 
 
 50
 (A) the debtor does not have an equity in such property;
 
 
 51
 (B) such property is not necessary to an effective reorganization.
 
 
 52
 It is noted that the new Act speaks of "on request of a party in interest." New Interim Bankruptcy Rule 4001(b) relating to ex parte relief from stay states, "On the filing of a complaint seeking relief from a stay under § 362(a) of the Code, relief may be granted ..." No specific rule deals with relief from a stay which is not ex parte. We think that the answer lies in the Revisor's Notes to § 362 which reads as follows:
 
 
 53
 The action commenced by the party seeking relief from the stay is referred to as a motion to make it clear that at the expedited hearing under subsection (e), and at hearings on relief from the stay, the only issue will be the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to air effective reorganization of the debtor, or the existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor, which, although relevant to the question of the amount of the debt, concern largely collateral or unrelated matters. This approach is consistent with that taken in In re Essex Properties, Ltd., 430 F.Supp. 1112 (N.D.Cal.1977), that an action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert counterclaims. These counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustee to recover property of the estate or to object to the allowance of a claim. However, this would not preclude the party seeking continuance of the stay from presenting evidence on the existence of claims which the court may consider in exercising its discretion. What is precluded is a determination of such collateral claims on the merits at the hearing. (Emphasis supplied).
 
 
 54
 Having concluded that the mere filing of the complaint for relief from a stay affords no ground for summary jurisdiction, we turn to the question as to whether Northwestern, by requesting administrative expenses for the use and occupancy of Northwestern's premises pursuant to the order of the bankruptcy court, has consented to summary jurisdiction on the cross-claim (counterclaim) by asking affirmative relief which goes beyond the relief from a stay. It may be argued that the definition of "claims" under Bankruptcy Act § 406(2) and 11 U.S.C. § 806(2), in effect in 1971, is sufficiently broad to include a demand for the payment of money for the use and occupancy of the premises pursuant to court order. We do not argue whether the demand was for rent due; it was due pursuant to a court order which had established the monthly rental payments to be made by the debtor or receiver during the pendency of the Chapter XI proceedings, or at least as long as the debtor or receiver remained in possession of the premises. The so-called "claim" under the court order, or for rent due as others may contend, was not due and owing at the time the Chapter XI proceeding was filed, nor was it listed in the schedules as the administrative expense had not been incurred. In fact, Northwestern was a successor owner of the property, having acquired title during the pendency of the Chapter XI proceedings but, of course, title was not acquired through the debtor or receiver.
 
 
 55
 Under 11 U.S.C. § 1111(a), as stated in P.L. 95-598, November 6, 1978, 92 Stat. 2630 admittedly not applicable to this case it is said:
 
 
 56
 (a) A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(1) or 1106(a)(2) of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated.
 
 
 57
 Thus, since 1978 it appears that only claims scheduled, which are not contingent, unliquidated or disputed, may be deemed filed. It is uncontroverted in this case that Northwestern never filed a proof of claim relating to anything listed in the schedule. We concede, however, that neither the 1978 amendments nor the new Bankruptcy Act effective October 1, 1979, can be considered as controlling, although it may shed some light on the effect of the prior law. In any event, the 1978 amendment and the new Act refer to a "request for payment of an administrative expense," and not to a "claim."
 
 
 58
 In Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), the court upheld summary jurisdiction where the creditor had filed two claims, one for rent due from the bankrupt and one for payment on one of the bankrupt's notes within four months prior to bankruptcy. It was in response to these two claims that the trustee objected to the claims and alleged the voidable preferences and demanded judgment against the creditor. It was the court's interpretation of § 57(g) of the Bankruptcy Act which supplied the necessary grounds for summary jurisdiction. In Northwestern's case there was no objection to the allowance of money for the use and occupancy of the premises during the pendency of the Chapter XI proceedings, but only an effort to assert a cross-claim, or counterclaim, alleging a "laundry list" of unrelated claims by reason of tortious acts or breaches of contract.
 
 
 59
 The bankruptcy court does, of course, have summary jurisdiction to adjudicate those matters which are (1) either "proceedings in bankruptcy," or (2) "controversies arising in proceedings in bankruptcy." Both situations are "terms of art." A "proceeding in bankruptcy" is a "ruling internal to the bankruptcy administration on such questions as adjudication, section 21a examination, discharge, exemptions, allowance of claims, and disposition of dividends." MacLachlan, Handbook of the Law of Bankruptcy, 431-32 (1956). "Controversies arising in proceedings in bankruptcy" refer only where it is necessary to determine" whether specific property belongs to the bankruptcy estate" such as in Katchen v. Landy, supra. If the third party, such as Northwestern, has consented, it is a waiver of the right to have the controversy tried in a plenary action. Since Northwestern consistently objected to the summary jurisdiction over the cross-claim (counterclaim) and at no time filed a proof of claim as such, the issue is whether its action in seeking money due, pursuant to a prior order, for the use and occupancy of Northwestern's property during the pendency of the Chapter XI proceedings constitutes the "filing of a claim". We believe that it does not, although there may be others who feel otherwise. It appears that the mere assertion of affirmative relief in a complaint filed to terminate the stay order does not, standing alone, constitute a forfeiture of the right to object to summary jurisdiction. Tamasha Town & Country Club v. McAlester Constr. Fin. Corp., 252 F.Supp. 80 (S.D.Cal.1966) (where the creditor sought relief from the injunction against foreclosure, and also sought authorizations to reclaim personal property; to have the debtor adjudicated a bankrupt; and to require the debtor to post bond, to account, and to appear for an examination.) These various requests were held to be defensive as they were directed to accomplish a termination of restraints on the creditor. Such is the situation with respect to Northwestern as the debtor's violation of the court order with respect to the payments for use and occupancy of the premises was the foundation for the basis of the termination of the stay order. The net result is that, unless a creditor expressly consents to the exercise of summary jurisdiction, the bankruptcy court has no authority to determine the validity of counterclaims raised by a debtor or receiver in answer to a creditor's complaint for relief from an automatic stay. By bringing an unliquidated counterclaim for alleged acts based upon tort or contract, this does not involve a "proceeding in bankruptcy," nor does it involve "controversies arising in proceedings in bankruptcy" as it is not a dispute over property of the debtor in the actual or constructive possession of the court: Simply stated, the cross-claim (counterclaim) is merely a claim for damages involving the alleged negligent acts or breaches of contract by Northwestern, the owner of the premises. We conclude that the cross-claim (counterclaim) was "totally unrelated" to either the termination of the stay or the amount due for the use and occupancy of the premises pursuant to court order. The Essex Properties approach, adopted by the New Bankruptcy Act, holds that a creditor's complaint to terminate a stay does not constitute a "claim" which would support counterclaims and affirmative defenses under the Federal Rules of Civil Procedure as the creditor's action is essentially defensive and compelled by the intervention of the Chapter XI proceeding.
 
 
 60
 It is settled law that an allowance for use and occupancy by the trustee, receiver or debtor-in-possession, of premises leased by a bankrupt, debtor, or receiver, is an expense of administration and does not arise out of the lease and has no relation to it. S & W Holding Co. v. Kuriansky, 317 F.2d 666 (2nd Cir. 1963); In re Chakos, 24 F.2d 482 (7th Cir. 1928); Lerner Stores Corp. v. Electric Maid Bake Shops, 24 F.2d 780 (5th Cir. 1928). It was entitled to priority as an actual and necessary cost and expense of preserving the estate, rather than being treated as a non-allocable claim to rent due by a debtor under provisions of 11 U.S.C.A. § 104(a)(5). In re Universal Medical Services, Inc., 357 F.Supp. 1137 (D.C.Pa.1973). While ordinarily any rental fixed by the terms of the lease will presumptively be regarded as fair rental value for the period the property was occupied by the court officer, In re Millard's, Inc., 41 F.2d 498 (7th Cir. 1930), in Northwestern case the bankruptcy court expressly fixed the monthly rental payments during the occupancy by the debtor-in-possession and receiver. Costs and expenses of administration must be paid during the proceeding on a current basis and cannot be deferred until there is a distribution to creditors. In re REA Express, Inc., 442 F.Supp. 71 (S.D.N.Y.1977).
 
 
 61
 In dealing with an asserted set-off involving an unliquidated tort claim in In re Drusilla Carr Land Corporation, 107 F.2d 565, 567 (7th Cir. 1939), the court said:
 
 
 62
 Even if the claim (a claim for conspiring to encumber and becloud the title to the land) were meritorious and filed in good faith, we do not think such argument (right of set-off) is tenable. The asserted set-off is a tort claim, unliquidated in amount, and is a claim in personam against appellee jointly with other persons. On the other hand, the claim of appellee is liquidated as to amount .... In fact, no claim has been filed by appellee against the bankrupt estate and we have serious doubts if it could maintain such a claim if it so attempted. Under such circumstances, it seems apparent that there was no "mutual debts or mutual credits" between the parties and, therefore, the law relied upon is not applicable.
 
 
 63
 We think it clear that Northwestern's assertion of administrative expenses pursuant to the order of the bankruptcy court and the cross-claim asserted by the debtor and receiver based upon unliquidated tort claims and alleged breaches of contract cannot possibly be considered as constituting "mutual debts or mutual credits," and one cannot be used as a set-off against the other.
 
 
 64
 While the bankruptcy court did not base its decision on the exercise of discretion in declining to rule on the cross-claim, there is a limited discretion available to a bankruptcy court to require matters to be litigated in state courts even where jurisdiction exists in the bankruptcy court. In re Wonderbowl, Inc., 456 F.2d 954 (9th Cir. 1972); Thompson v. Magnolia Co., 309 U.S. 478, 483, 60 S.Ct. 628, 630, 84 L.Ed. 876 (1940); Texas v. Donoghue, 302 U.S. 284, 58 S.Ct. 192, 82 L.Ed. 264 (1937); Foust v. Munson S. S. Lines, 299 U.S. 77, 57 S.Ct. 90, 81 L.Ed. 49 (1936). We assume, however, that the bankruptcy court did not consider this issue as it held that it was without jurisdiction to summarily hear the subject matter of the cross-claim.
 
 
 65
 AFFIRMED.
 
 
 
 *
 Of the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The record does not contain the entire Chapter XI file and the precise date of filing the petition is not disclosed, but it is of no consequence
 
 
 [2]
 "Installment payments" only included the stipulated payment of $3352 per month for 8 months, and did not include the additional sum of $1500 per month for rental delinquencies
 
 
 [3]
 We do not concern ourselves with the use of the word "cross-claim". The applicable law would be the same if the document had been denominated a "counterclaim"
 
 
 [4]
 Green was an unlawful detainer action. Hinson was an action by the tenant by way of declaratory judgment. In Green, if not also Hinson, the court emphasized that it was dealing only with residential property
 
 
 [5]
 Medico-Dental involved a lease which, according to the intention of the parties, was deemed an express dependent covenant. While the case pertained to commercial property, it has no application to an implied warranty of habitability
 
 
 [6]
 The Swords case points out that the loss of possession, pursuant to an act of the landlord, goes to the very root of the consideration for the tenant's promise to pay rent, and, after the eviction the obligation to pay rent ceases. In this sense the implied warranty of quiet enjoyment and the express covenant to pay rent are mutually dependent. However, in our case, assuming the truth of the matters asserted in the cross claim, only the beneficial use of the premises is affected
 
 
 [7]
 Swords discusses and distinguishes Medico-Dental and Green, both supra
 
 
 [8]
 PIC claimed under the terms of the lease; Northwestern's complaint for relief asserted its right to possession and termination of any lease agreement (as well as money due) under the terms of the order entered by the court
 
 
 [9]
 In the Advisory Committee's Note to Rule 601 (providing for an automatic stay and relief therefrom), the Committee, in referring to ex parte relief from stay, said, "The procedure provided under subdivision (d) is patterned on that governing the issuance of a temporary restraining order under Rule 65(b) ... but the order is not subject to the 10-day limit that applies to temporary restraining order. In any proceeding to determine whether the stay provided by this rule shall be continued, the burden of justification rests on the trustee, receiver, or other party seeking its continuation."