In re Billy F. McGINNIS, Bankrupt.

BANK OF MEEKER, Plaintiff-Appellant,

v.

Billy F. McGINNIS, Defendant-Appellee.

No. 76–2000.

United States Court of Appeals,
Tenth Circuit.

Submitted March 17, 1978.

Decided Nov. 1, 1978.

Kienzle, Jay, Clifton, Shallcross & Womack, Prague, Okl., for plaintiff-appellant.

Richard James, Stroud, Okl., for defendant-appellee.

Before SETH, Chief Judge, and DOYLE and McKAY, Circuit Judges.

McKAY, Circuit Judge.

This case involves an attempt by the Bank of Meeker (Bank) to avoid the discharge in bankruptcy of a debt owed to it by Billy Fred McGinnis (McGinnis). The Bank seeks refuge under 11 U.S.C. § 35 (1976), which excepts from discharge any liabilities for willful and malicious conversion. The Bankruptcy Court concluded that

there had been no willful and malicious conversion and that the debt should be discharged. The District Court for the Western District of Oklahoma affirmed, and the Bank now appeals.

The Bank's allegations on this appeal are rooted in 11 U.S.C. § 35(a)(2) (1976). In relevant part, this section provides:

A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . are liabilities . . . for willful and malicious conversion of the property of another . . . .

We have construed the phrase "willful and malicious" as follows:

[W]illful and malicious conduct causing injury to the person or property of another . . . does not necessarily mean or involve a malignant spirit or a specific intention to injure a particular person or harm his property. A willful disregard of that which one knows to be his duty, or an act which is wrongful in and of itself, and which necessarily causes injury, if done intentionally, is done willfully and maliciously, within the scope of the exception to dischargeability created by the statute.

*Den Haerynck v. Thompson,* 228 F.2d 72, 74 (10th Cir. 1955); *accord, McIntyre v. Kavanaugh,* 242 U.S. 138, 141–42, 37 S.Ct. 38, 61 L.Ed. 205 (1916); *see* 1A *Collier on Bankruptcy,* ¶ 17.17[1] (14th ed. 1978). Malignant misappropriation is not a requirement of the exception; rather, the emphasis is on intentional disregard for another's rights. But not every act of conversion intentionally accomplished without regard for another's rights will qualify. The Supreme Court made this clear in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934).

*Davis* involved, as does this case, an attempt by a secured creditor to avoid the discharge of a debt on the ground that the debtor sold certain collateral in his possession without the creditor's consent. With respect to the creditor's claim that the apparent conversion prevented the debtor's discharge, Justice Cardozo, writing for the Court, observed:

The respondent contends that the petitioner was liable for a willful and malicious injury to the property of another as the result of the sale and conversion of the car in his possession. There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception. . . . But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. . . . There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

293 U.S. at 331–32, 55 S.Ct. at 153. In measuring the case before him against the articulated standard, Justice Cardozo failed to find any elements of willfulness or malice that justified an exception to discharge.

■ Thus, a "technical" or "innocent" conversion will not qualify for the exception. *See, e. g., St. Paul Fire & Marine Ins. Co. v. Elliott,* 385 F.Supp. 1194 (M.D.La. 1974). Neither will a conversion accomplished with the knowing acquiescence of the creditor. In *Bennett v. W.T. Grant Co.,* 481 F.2d 664 (4th Cir. 1973) (per curiam), the court noted that the conduct of a creditor could defeat the availability of the exception to discharge. Specifically, if the creditor

acquired knowledge of the transaction at a time when it could have asserted its security interest in the property and failed to take reasonable steps to protect its security, the indebtedness secured thereby should be discharged.

481 F.2d at 666. The court said this result flowed from principles of equity basic to bankruptcy adjudications.

■ It is well established that the creditor has the burden of proving a willful and malicious conversion. *E. g., Kreitlein*

*v. Ferger,* 238 U.S. 21, 26, 35 S.Ct. 685, 59 L.Ed. 1184 (1915); *In re Nance,* 556 F.2d 602, 605 (1st Cir. 1977); *United States Fidelity & Guar. Co. v. Tanner,* 279 F.Supp. 396, 399 (D.Colo.1968). It is also apparent that fact findings by lower courts in bankruptcy proceedings will not be set aside on appeal unless clearly erroneous. Rule 810 of the Bankruptcy Rules makes this review standard obligatory on district courts evaluating the fact findings of bankruptcy courts. 11 U.S.C. App. Rule 810 (1976). The same standard applies to appellate courts when reviewing district court decisions which have adopted the findings of bankruptcy judges. *E. g., Smiley Professional Ass'n v. Phelps,* 484 F.2d 864, 867 (10th Cir. 1973); *Washington v. Houston Lumber Co.,* 310 F.2d 881, 882–83 (10th Cir. 1962). The meaning of the standard has been succinctly stated by the Supreme Court:

> A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). This is the standard we apply here.

Although the fact findings made by the Bankruptcy Court are not elaborate, they are sufficient to inform us of the basis for its decision. *See United States v. Horsfall,* 270 F.2d 107 (10th Cir. 1959); *Tulsa City Lines, Inc. v. Mains,* 107 F.2d 377 (10th Cir. 1939). The court determined that the Bank had failed to demonstrate the perpetration of a willful and malicious conversion of property. A review of the evidence considered by the Court follows.

McGinnis maintained two accounts at the Bank. One was his personal account. The other was denominated a "livestock" account. McGinnis also borrowed money from the Bank from time to time, and the Bank took security interests in various chattels, principally livestock. In 1974 the Bank became concerned that collateral diminu-

tion had resulted from livestock transactions carried out by McGinnis. Responding to its concerns, the Bank requested a consolidation of earlier notes and the attachment of a new security interest. Pursuant to this request, a livestock inspection was conducted by Bank representatives and a new security interest was obtained by the Bank in a 1971 Ford truck and McGinnis' entire stock of 140 cattle and 40 hogs. A subsequent inspection by the Bank revealed an increase in the number of McGinnis' cattle. McGinnis then sold some of the animals without paying the proceeds to the Bank. On November 26, 1975, McGinnis declared bankruptcy. The Bank thereafter took possession of the remaining collateral, which consisted of 47 cattle and the 1971 truck.

Finding that the available collateral failed to satisfy its security interest, the Bank sought to prevent the discharge of the underlying debt. It alleged that McGinnis had willfully and maliciously converted the collateral and should be denied discharge.

The testimony before the Bankruptcy Court provides considerable support for the trial court's conclusion. The Bank emphasized at trial that the parties' security agreement required written consent by the Bank to any sale of security by McGinnis. The Bank's vice president denied that consent was ever given. Under cross-examination, however, the Bank's vice president admitted that the provision was a standard one that was not enforced in practice. Indeed, the vice president confessed that there was a general understanding that collateral could be sold without authorization as long as the proceeds were applied to the loan balance.

The Bank's witness nonetheless insisted that the Bank expected McGinnis to maintain the collateral intact. He denied that the Bank knew of McGinnis' cattle trading. However, under cross-examination, the vice president admitted awareness of several checks which had been deposited in McGinnis' livestock account. He also said that the observed increase in McGinnis' herd subsequent to the 1974 inspection evidently had resulted from trading.

McGinnis testified that his occupation was that of a cattle trader, that various Bank officials knew this, and that he had borrowed money to finance his trading operations. He further testified that the sale proceeds had been spent to maintain the livestock, and produced some records to substantiate his claim. McGinnis suggested that his bleak economic situation had resulted from plummeting prices in the cattle market.

The Bankruptcy Court acknowledged that there had been "some unexplained lessening of numbers" in the Bank's collateral, but this was not enough to prevent the discharge. The court found that the Bank knew McGinnis bought and sold cattle on a regular basis. After referring to the dramatic drop in cattle prices and after observing that McGinnis' records tended to confirm his expenditure of the proceeds on herd maintenance, the court ruled that the Bank had failed to meet its burden of proving a willful and malicious conversion.

Upon reviewing the evidence, we do not have the definite conviction that a mistake has been made. We cannot say that the findings of the Bankruptcy Court are clearly erroneous.

In acting as an appellate court, the District Court reasoned below that the Bank's knowledge of the cattle trading prevented application of the exception to discharge in two respects. First, the court regarded the Bank's knowledgeable acquiescence in the trading as giving rise to a course of conduct which could have led McGinnis to believe he was justified in selling the collateral to fund his business operations. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Second, the court said that the Bank's failure to take reasonable steps to protect its collateral in the face of the ongoing trading prevented the application of the exception under the rule of *Bennett v. W.T. Grant Co.*, 481 F.2d 664 (4th Cir. 1973) (per curiam), which is set forth above. We fully agree with the District Court's analysis.

The Bank also argues that McGinnis was guilty of a willful and malicious conversion as a matter of law. The apparent meaning of this contention is that it is *per se* a willful and malicious conversion for a debtor in possession of collateral to dispose of it without the creditor's consent. No finding that the disposal was conducted without the creditor's consent was made below; indeed, implicit in the Bankruptcy Court's analysis is the fact that the Bank had acquiesced in the trading operation. But the Bank would not necessarily succeed even if the finding on consent had been favorable to the Bank's position. We have already observed that a sale of collateral without the creditor's consent can constitute an "innocent" or "technical" conversion not cognizable under the Bankruptcy Act's willful and malicious conversion provision. Simply stated, the Bank's proposed *per se* rule is not the law.

AFFIRMED.