**In re Albert G. JOHNSON, Jr. and Mary Helen Johnson, Debtors.**

**UNITED STATES of America, Plaintiff,**

**v.**

**Albert G. JOHNSON, Jr. and Mary Helen Johnson, Defendants.**

Bankruptcy No. 83–00237(SE).

Adv. No. 83–0167(SE).

United States Bankruptcy Court, E.D. Missouri, Southeastern Division.

May 18, 1984.

Edwin B. Brzezinski, Asst. U.S. Atty., St. Louis, Mo., for plaintiff.

Gene R. Yokley, Sikeston, Mo., Francis J. Siebert, Scott City, Mo., for defendants.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

The United States of America through its agency the Farmers Home Administration of the Department of Agriculture (FmHA) seeks a determination that indebtedness owed it by Defendants and totaling, as of July 25, 1983, $117,074.73, is non-dischargeable. Plaintiff alleges that Defendants willfully and maliciously converted its property by selling crops in which it had a security interest without its consent and by failing thereafter to pay over the proceeds of these crops to it. Thus, Plaintiff asserts that the indebtedness owed, arises from a "willful and malicious" injury to its property within the meaning of 11 U.S.C. § 523(a)(6) and should be determined to be non-dischargeable. It also alleges that Defendants have failed to account for and explain the disposition of their 1981 crops and, therefore, should be denied a discharge under 11 U.S.C. § 727(a)(5).

The history of the case is as follows:

1. During the fall of 1980, Defendants made application to Plaintiff for loans to finance their 1981 crop production and also to purchase equipment for use in their farm operations. In connection with their application, Defendants, on September 30, 1980, executed a loan application containing personal and financial information and also, on December 5, 1980, executed a document entitled "Farm and Home Plan". On this latter document Defendants listed information on their assets and liabilities and projected their income and expenses for 1981. During the preliminary stages of this transaction, Defendants dealt with one Richard Radford, an individual who had contracted with Plaintiff to handle loan applications in Defendants' geographical area and also to make recommendations on their approval or disapproval. Mr. Radford was not an employee of Plaintiff.

2. Plaintiff approved Defendants' loan application. On April 1, 1981, Defendants executed two (2) promissory notes in favor of the FmHA, one in the original amount of $64,000.00 and payable together with interest in its entirety on January 1, 1982, and the other note in the original amount of $79,300.00 and payable in seven annual installments of $17,102.00 each with the first such installment due on January 1, 1982. As security for the notes, Defendants executed a security agreement covering farm equipment and their 1981 crops, yet to be planted and harvested. Part III, Paragraph B, subsection (6) of the security agreement provides that:

Debtor will not abandon the collateral, or encumber, conceal, remove, sell, or otherwise dispose of it or of any interest therein, or permit others to do so, without the prior written consent of Secured Party.

Paragraph K of that same part of the security agreement provides, in bold-faced type:

Secured Party has informed Debtor that disposal of property covered by this security agreement without consent of Secured Party, or making any false statement in this security agreement or any other loan document, may constitute a violation of federal criminal law.

At this loan closing, Defendants dealt with officials of FmHA and not with Richard Radford.

3. Defendants, during 1981, leased approximately 600 acres of farm land, 395 of these acres were rented on a cash basis and 280 of these acres were rented on a crop share basis. On these acres, Defendants planted a variety of crops and harvested them in the fall of 1981.

4. After harvest, Defendants sold their crops to various grain companies in the area. Defendant, Albert Johnson, at the hearing, admitted that he had not obtained the consent of FmHA prior to his selling of the crops nor did he pay over the entire proceeds to FmHA. He did, however, on December 21, 1981, make a payment of $15,000 to FmHA.

5. Defendants defaulted on the remainder of the payments due on January 1, 1982. On January 4, 1982, Defendants made application to FmHA for the financing of their 1982 crop production. On January 5, 1982, the FmHA county committee certified Defendants eligible for such financing. On February 2, 1982, Defendant, Albert Johnson, had a conference with FmHA employees regarding his default and the disposition of his crops. These employees were apparently dissatisfied with his explanations and conducted their own inquiry into the disposition of Defendants' crops. After verifying the crop sales and the amounts received by Defendants, FmHA informed Defendants that it would provide them no further financing and requested them to liquidate the farm equipment given as collateral for its loans. Defendants did this and remitted the proceeds to FmHA.

6. On July 25, 1983, Defendants filed a petition for relief under Chapter 7 of the Bankruptcy Code.

FINDINGS AND CONCLUSIONS

In its complaint, Plaintiff alleges two separate bases for relief:

(1) Defendants have failed to satisfactorily explain and account for the proceeds of their 1981 crops and, therefore, should be denied their discharge under 11 U.S.C. § 727(a)(5); and

(2) Defendants willfully and maliciously converted FmHA's security interest in their 1981 crops by selling this crop without the knowledge and consent of FmHA and by not paying over the entire proceeds to FmHA and, therefore, the indebtedness arising from such conversion is non-dischargeable under 11 U.S.C. § 523(a)(6).

*Failure to explain and account for disposal of proceeds of 1981 crops.*

Plaintiff did not pursue this allegation very forcefully at the hearing, however, it does not appear to have abandoned this allegation or their objection to discharge. Hence, the Court must review the record to see if there exists an unexplained deficiency in Defendants' accounting of their 1981 crop proceeds.

The apparent factual basis of Plaintiff's objection to discharge is the fact that Defendant, Albert Johnson, in a document entitled Farm and Home Plan (Defendant's Exhibit 1) stated that the proceeds of his 1981 crop totaled $80,117.00. Yet, at the hearing Mr. Johnson testified that he only received approximately $55,000 for his 1981 crop. Further at the hearing, Mr. Johnson produced sales receipts for his crops totaling to the latter amount.

While these conflicting statements and certain other inconsistent statements which Defendant, Albert Johnson, may previously have made regarding the disposition of his 1981 crop proceeds, do initially raise a suggestion of concealment of assets, a closer review of the record shows that Defendants' financial records account for the proceeds of his 1981 crop and that no evidence of any concealment exists.

Defendants' Exhibit 2 was an envelope containing all of Defendants' cancelled checks from his farm operation for the year 1981. These checks total approximately $188,000 and do not include a check in the amount of $15,000 payable to the Plaintiff. Thus, Defendants' expenses or cash *out* flow for 1981 were approximately $203,000.00.

From the record before the Court, Defendants had two sources of cash *in* flow for 1981. The net cash proceeds of Defendants' loans from Plaintiff were one source and the proceeds of Defendants' 1981 crop sales were the other. The cash proceeds from the loans totaled $128,100 (a total loan amount of $143,300 less $15,200 to pay off existing indebtedness to other

parties). Subtracting that amount from $203,000 leaves a difference of $74,900.

A close review of the itemization of actual receipts for the sale of Defendants' 1981 crops, contained in Part B of Defendants' Exhibit 1, shows that Defendant, Albert Johnson, actually only reported crop sales totaling $69,457.00 on that document rather than crop sales totaling $80,117.00. On line 4 of that section, Defendant, Albert Johnson, originally put down $10,660 for corn. That figure was then crossed out with the notation that it was "swap (sic) for beans". At the hearing, Defendant testified that he traded his corn crop for soybeans from a neighboring farmer. However, this figure of $10,660 was not deleted in the original total of $80,117 shown on line 15 of Actual Crop Receipts under that section of Defendants' Exhibit 1. The actual total of crop receipts reported on that document is $69,457.00. Adding that sum to the $128,100 in cash loan proceeds leaves a total of $197,557.00, a figure less than Defendants' 1981 expenses. Moreover, a review of the cancelled checks comprising Defendants' Exhibit 2 does not reveal any "suspicious" transfer of funds and Plaintiff has not demonstrated any unexplained loss of assets. Hence, Plaintiff's objection to Defendants' discharge under 11 U.S.C. § 727(a)(5) will be overruled.

*Willful and Malicious Conversion*

The main thrust of Plaintiff's complaint is its contention that Defendants willfully and maliciously converted its security interest in Defendants' 1981 crops by selling said crops without its consent and by not thereafter paying over the proceeds to it in satisfaction of their debt. Subsection (5) of paragraph B of Part III, Plaintiff's Exhibit C, the security agreement dated April 1, 1981, executed by Defendants and covering Defendants' 1981 crops, in part, provides that Defendants will not sell the collateral under the agreement without the prior written consent of Plaintiff. Paragraph K of Part III of this security agreement states in large bold-face type:

SECURED PARTY HAS INFORMED DEBTOR THAT DISPOSAL OF PROP-ERTY COVERED BY THIS SECURITY AGREEMENT WITHOUT THE CONSENT OF SECURED PARTY OR MAKING ANY FALSE STATEMENT IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT, MAY CONSTITUTE A VIOLATION OF FEDERAL CRIMINAL LAW.

Paragraph K is the next-to-the-last paragraph of the security agreement and is located right above the signature lines where the Defendants had signed.

At the hearing, Defendant, Albert Johnson, testified that he never read the security agreement before signing it and did not receive a copy of it afterwards. He further testified that he was unaware of any requirement that he obtain the written consent of the Plaintiff's employees prior to his sale of the crop.

Plaintiff contends that since it has shown that Defendants sold their 1981 crop in breach of the latter terms of the security agreement, it has shown that Defendants willfully and maliciously converted its security interest within the meaning of 11 U.S.C. § 523(a)(6). Plaintiff, it would appear, is asking the Court to conclude that Defendants, by executing the security agreement containing the above quoted restrictions, are chargeable with knowledge of the restrictions imposed on the sale of their crops.

■ The leading case on the subject of what constitutes a "willful and malicious" conversion of a security interest is *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). In that case, the Supreme Court rejected the notion that any act of conversion was a willful and malicious injury within the meaning of section 17(a)(2) of the former Bankruptcy Act which also excepted from discharge liabilities for willful and malicious injuries to property. As the Court, at page 332, 55 S.Ct. at page 153, of its opinion, stated:

There is no doubt that an act of conversion, if wilful and malicious, is an injury to property within the scope of this exception. Such a case was *McIn-*

*tyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205, where the wrong was unexcused and wanton. But a wilful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice.... There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a wilful and malicious one.

■ After considering the evidence, the Court finds that Defendants as a result of the acquiescence of Plaintiff's employees in their sale of the crop, had a good faith belief and, in fact, could have reasonably believed that, notwithstanding any language in the security agreement to the contrary, they were not required to pay over to Plaintiff the proceeds of the sale of their 1981 crop. Hence, they honestly believed that the prior consent of Plaintiff was not mandatory and, thus, their conversion of Plaintiff's security interest was innocent and not "willful and malicious" within the meaning of 11 U.S.C. § 523(a)(6).

The evidentiary facts upon which the Court bases its finding are the following:

(1) Since farm crops were the collateral securing its loan, Plaintiff's employees knew that the collateral would be sold in the fall or early winter of 1981. Further, in light of Defendants' expense projections for 1981 contained in their loan application and their lack of any other sources of revenue, Plaintiff's employees were aware that the operating loan being made to Defendants would not cover their projected expenses. Thus, they were aware that certain production expenses would be unpaid at the time of the harvest of Defendants' crops. Yet, other than the language of the security agreement, there is no evidence that Plaintiff's employees instructed Defendants on how they should proceed at the time they chose to sell their crops. Plain-

tiff's employees never advised Defendants that they would have to pay over the proceeds of their crop sales to Plaintiff notwithstanding the existence of other unpaid production expenses. In short, Plaintiff's employees never made any formal arrangements to insure payment of their loans first out of the sale of Defendants' crops.

(2) Jeff Gossett, an account supervisor for Plaintiff in charge of the loans in question, testified at the hearing that in September, 1981, he became aware that Defendants had already harvested some of their crops. Yet, there is no evidence that he or any other of Plaintiff's employees contacted Defendants regarding their plans for selling their crops and the protection of Plaintiff's security interest.

(3) The ensuing questions and answers between Jeff Gossett and Defendants' counsel show his acquiescence in Defendants' conversion of Plaintiff's security interest in Defendants' crops.

*QUESTION*: Well, you didn't have any objections to removing the crops?

*ANSWER*: No, sir.

*QUESTION*: ... and knew that he was going to sell them?

*ANSWER*: Yes.

*QUESTION*: That's what you do with crops?

*ANSWER*: Right.

*QUESTION*: As far as the sale of the crops, you're not objecting to that—The only thing you got a problem with is that you say that he didn't adequately explain where the crops went?

*ANSWER*: He didn't pay the mortgages that the crops secured—pay the notes that the crops secured.

*QUESTION*: That's your only complaint, really—that you didn't get paid?

*ANSWER*: Well, correct. He's in default on his notes.

(4) Despite Defendants' conversion of Plaintiff's security interest and their failure to pay the amounts due under their promissory note on January 1, 1982, Defendants' application for a 1982 crop production loan from Plaintiff was initially

760

approved on January 5, 1981, on a local level. Only later, after a review of Defendants' financial situation was undertaken by Jeff Gossett and other FmHA officials, was such approval withdrawn. This suggests a willingness, at least on the part of some of Plaintiff's employees in January, 1982, and, by inference at earlier times, to "work" with Defendants and extend the repayment requirements of the promissory notes in question.

In short, notwithstanding the provisions of the security agreement, Plaintiff's employees, despite this knowledge of the sale of Defendants' crops, failed to take any action to protect or assert Plaintiff's security interest in the crops in question and, therefore, acquiesced in any conversion of that security interest.

The facts of this case are very similar to those in the case of *Bank of Meeker v. McGinnis*, 586 F.2d 162 (10th Cir.1978) in which the appellate court concluded that a bankruptcy court finding of dischargeability was warranted by those facts. They are also very similar to the facts in *United States v. Langer*, 12 B.R. 957 (D.N.D.1981) where the district court also affirmed a bankruptcy court finding that the debtor's conversion of a security interest in crops was not malicious under section 523(a)(6).

Accordingly, the indebtedness owed Plaintiff by Defendants is dischargeable.

The Court will enter a separate order consistent with this opinion.