**In the Matter of Kenneth Dwain IRELAND, and Mary Etta Ireland, Debtors.**

**The AMERICAN BANK OF SPICKARD–TRENTON, Plaintiff,**

v.

**Kenneth Dwain IRELAND, and Mary Etta Ireland, Defendants.**

Bankruptcy No. 84–02410–SJ.
Adv. No. 84–0523–SJ.

United States Bankruptcy Court,
W.D. Missouri,
St. Joseph Division.

May 14, 1985.

James T. Holcomb, Trenton, Mo., for plaintiff.

Hugh A. Miner, Hugh A. Miner, P.C., St. Joseph, Mo., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL DECREE AND JUDGMENT DENYING COMPLAINT TO DENY DISCHARGE

DENNIS J. STEWART, Bankruptcy Judge.

This is an action in which the plaintiff objects to the discharge in bankruptcy of

the debtors for their alleged failure to pay the plaintiffs the proceeds of sale of certain of the plaintiff's collateral. The issues joined by the pleadings came on before the court for hearing on March 12, 1985, in St. Joseph, Missouri, whereupon the plaintiff appeared by counsel James T. Holcomb, Esquire, and the defendants appeared personally and by counsel, Hugh A. Miner, Esquire. The evidence then adduced warrants the following findings of fact.

The debtors requested a loan of $4,500 from the plaintiff in July 1983. In connection with their application, the debtors represented that they owned certain chattels, including 58 cows, 52 calves and 2 Simmental bulls. Thereafter, sometime in October 1983, Ray Dockery, vice president of the plaintiff bank, went to the debtors' farm to check on the presence of this collateral. Because the collateral was then represented by the debtors to be in three or four different places, he was then unable to ascertain the presence of all the collateral. He was able to count only those which were on Chuck Patterson's land—27 cows, 2 calves and 1 bull. A second attempt to find the cattle on the following evening met with even less success in terms of fewer cattle counted. The debtors were then, according to Mr. Dockery's testimony, unable to explain the absence of the remaining cattle.

It was then decided between the bank and the debtors that a liquidation should be carried out. In connection therewith, on December 2, 1983, the debtors submitted to the bank a second financial statement in which they admitted that they had only 47 cows, 47 calves, and 2 Simmental bulls. Mr. Dockery saw at least some of these cattle and reported that they seemed very normal and healthy. In the liquidation sale some 83 cattle were sold and a check for their sale was given to the bank by the debtors. According to Mr. Dockery, Mr. Ireland then reported that the few remaining cattle were still in his possession.

There were thereafter no further conversations as to when other cattle would be sold. In September of 1984, after the debtors had filed the within bankruptcy case, the debtor Kenneth Dwain Ireland stated that two or three of the remaining cattle had died, and that two or three were sold and the proceeds of sale were "put back in the operation." There was apparently a horse with respect to which no testimony was given in the course of the meeting of creditors.

Under cross-examination, Mr. Dockery admitted that frequently cattle are sold to pay bills, but stated that "we expect to be paid and advance the money back for feed bills." The sale of the cattle and other chattels subject to the bank's security interests left a balance due of some $14,-580.90 due and owing to the bank.

For the most part, the testimony of the debtor Kenneth Dwain Ireland was in congruence with that of Mr. Dockery. He denied, however, that any cattle were sold until January 7, 1984, when the agreed-upon "liquidation sale" was held and the proceeds turned over to the bank. He admitted that some cattle were still then left in his possession. He stated that he sold two of them which were afflicted with foot disease and received $400–$450 for them. Additionally, he sold two cows and three calves and received "around $400 apiece" for the two cows and $250 apiece for the three calves. He put the proceeds of these sales "back into the [farming] operation." He admitted that he had entered into no separate understanding with the bank by which this was permitted. Later, in July or August of 1984, he lost the remaining two or three cows by death. He denied selling any other cattle or converting any to his own use. As to the initial difference between the number of cattle reported in the July 1983 financial statement and that of December 1983 was that he had, in the intervening six months, lost some of the cattle by death and also sold some and devoted the proceeds to the farming operation.

### Conclusions of Law

■ It is essential to denying discharge or granting a decree of nondischargeability on the grounds of conversion

of collateral that the plaintiff demonstrate the existence of an actual wilful and malicious intention.[1] In this district, the decisions have gone to the extreme of requiring of proof of such an intention by means

of a rigid subjective standard, under which the debtor's conversions are excused if he has a good faith, albeit unreasonable, belief that he has a right to deal with the property as his own.[2] If the debtor could have,

1. See section 727(a)(2) of the Bankruptcy Code, providing that discharge may be denied if "the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed ... property of the debtor, within one year before the date of the filing of the petition." Cf. section 523(a)(6) of the Bankruptcy Code to the effect that "(a) discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." "(I)t must be considered that the denial of a discharge in bankruptcy is a harsh and drastic penalty. Consequently, our district court has consistently held that, when intention is required to be shown as a prerequisite to the denial of a discharge or a decree of nondischargeability, it must be a subjective, actual intent. See, e.g., *Matter of Bellmer*, Civil Action No. 79–6042–CV–SJ (W.D.Mo.1980) ('In reviewing the cases on this issue, the Court is convinced that the "willful and malicious" requirement of the statute is meant to impose the necessity of finding a *subjective, conscious* intent whether through recklessness, malice, or dishonesty, to convert the property.'). This rule has been held particularly to apply in cases in which the debtor has disposed of property in a good faith, albeit mistaken, belief that he had a right to do so. 'A good faith belief, even though unreasonable, precludes a wilful and malicious intent.' *Matter of Roberts*, 8 B.R. 291, 293 (W.D. Mo.1981)." *Matter of Alan Louis Roberts*, Adversary Action No. 82–0785–3 (Bkrtcy.W.D.Mo. Nov. 9, 1982). "(I)t must be observed that, under the applicable authorities, the 'intent to hinder, delay, or defraud' which section 727(a)(2), Title 11, United States Code, makes prerequisite to the denial of discharge is an actual intent which is equally subjective as that defined by the decisions rendered under section 523(a)(6).... 'In order to justify a refusal of discharge ..., it must be shown that the acts complained of were done with an intent to hinder, delay, or defraud his creditors. This intent, moreover, must be an *actual fraudulent intent* as distinguished from constructive intent.' 1A Collier on Bankruptcy para. 14.47(1), pp. 1410, 1411 (1978) (Emphasis added). Cf. *In re Adlman*, 541 F.2d 999 (2d Cir.1976)." *Matter of Alan Louis Roberts*, Adversary Action No. 82–0785–3 (Bkrtcy.W.D.Mo. Dec. 13, 1982).

2. See note 1, *supra*. The *Bellmer* case there cited offers a good study in how difficult it can be to gain a denial of discharge or a dischargeability decree under the rules fixed by the district court. In that case, the defendant admit-

tedly sold accounts receivable which were subject to the plain letter of a security instrument to a third party. He stated in the trial of the action that he believed that the accounts receivable were not subject to the security interest because they were acquired after the date of the security interest. The security agreement itself contained a provision "(t)hat the security interest herein granted shall extend to all future advances made by the secured party and to any after acquired property of the same, type, kind or nature purchased by the debtor, whether as replacement or otherwise." The bankruptcy court accordingly held the conversion to be nondischargeable, stating that the debtor could not defeat the rights "of others by simply closing his eyes to those rights. When the defendant knew of the existence of a contract respecting some accounts receivable, he was surely put on inquiry to acquaint himself with its terms. Refusal to read the pertinent provisions of the contract under these circumstances constitutes a form of intentional conduct in itself. And this principle is recognized in the many decisions which equate reckless disregard of another's rights ... with intentional disregard." On review, the district court descried an ambiguity in the promissory note's stating that it was "secured by the deposit *herewith* of accounts receivable," thus seeming to ignore the fact that such a statement did not rule out the existence of other security. It was further noted that the bank officer had explained to the debtor that the security included "the accounts receivable of the previous loan plus the ones that were given to us afresh on this new loan." This could have created no ambiguity, when the "ones ... given ... afresh" included, as a matter of law, those which were after-acquired. The defendant's knowledge of this was evidenced by his bringing the acquiring of such later accounts receivable to the attention of the creditor. The bankruptcy court, therefore, as noted above, accordingly found that the debtor, in disposing of the collateral on his own account (particularly when the particular type of collateral involved was not usually sold) intentionally violated a known right of the secured creditor. This seemed to adhere to the correct standard of law which was then, under the former Bankruptcy Act, being employed. "An injury to person or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill will.... Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may

by seizing upon the slightest ambiguity in the security instrument, by almost any form of reasoning, justified converting the collateral to his own use, the decisional precedents in this district excuse it.[3] In this case, the course of conduct between the parties, according to the testimony of Mr. Dockery himself, was that the proceeds of the sale could be advanced for feed, even though they sould ordinarily be reported to the bank.[4] From this, the debtor might have formed the good faith belief, which he professes to have, that he could simply sell some of the cattle and reinvest

---

constitute a willful and malicious injury.... Thus, the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is a willful and malicious injury within the meaning of the exception." 1A Collier on Bankruptcy para. 17.17, pp. 1650.4, 1652, 1653, 1654 (14th ed. 1976). Under this well-established old rubric, it was generally held that "(i)t is a willful and malicious injury to property within the meaning of this section for a chattel mortgagee in possession of the property and the payee of notes which had been put up as collateral security, to sell the mortgaged property and appropriate the proceeds thereof without the knowledge of the person holding the collateral." *Id.*, p. 1655, n. 9. It would appear that the rule could not have been otherwise if the contents of the security instrument were anything close to unambiguous. In *Bellmer*, however, the district court seized upon whatever could be teased into ambiguity and found that the "willful and malicious" standard was not met. It further seized upon certain statements of the law made in cases in which the secured creditor had *consented to* or *acquiesced in* conversion of chattels in order to contradict the rule asseverated above. Thus, *In re McGinnis*, 586 F.2d 162, 165 (10th Cir.1978), is quoted for the principle that "(w)e have already observed that a sale of collateral without the creditor's consent can constitute an 'innocent' or 'technical' conversion not cognizable under the Bankruptcy Act's willful and malicious conversion provision." But the only exception to the rule which is previously mentioned in this decision is that of a "conversion accomplished with the knowing acquiescence of the creditor" where "the creditor 'acquired knowledge of the transaction at a time when it could have asserted its security interest in the property and failed to take reasonable steps to protect its security ...'" These facts did not fit the *Bellmer* case. The other decisions specifically relied upon in the *Bellmer* decision similarly developed the theme that conversion with consent or acquiescence could not be "willful and malicious" within the meaning of the nondischargeability statute, *Bennett v. W.T. Grant Co.*, 481 F.2d 664 (4th Cir.1973), and that a specific finding of "willful and malicious" must be made by the trial court. *Robertson v. Interstate Securities Company*, 435 F.2d 784 (8th Cir. 1971). It appears to be obvious from this decision of the district court that even the slightest reason for doubt as to the debtor's duty directly to pay over the proceeds of secured collateral to the secured creditor, caused either by the agreement itself or the conduct of the parties under it, will result in a decree of nondischargeability being set aside. In the action at bar, the plaintiff's own witness admitted that some of the proceeds are expected to be reinvested in the operation. Although he further stated that the bank expected that the parties observe the formality of their being first paid to the bank and then released by the bank, the net result is the same. And the bankruptcy courts, it is constantly held, are courts of equity, which must "look ... through form to substance, (and) treat the transaction according to its real nature." *Katz v. First Nat. Bank of Glen Head*, 568 F.2d 964, 970 (2d Cir.1977).

**3.** See note 2, *supra*. A decision which is perhaps more bewildering than the *Bellmer* decision is *In re Roberts*, 8 B.R. 291 (W.D.Mo.1981), in which the debtor falsely represented to the lending bank that he was purchasing the automobile on his own account, when he really intended to purchase it on behalf of his sister. The bank approved and extended the loan and the sister promptly absconded with the automobile. There was evidence that the automobile dealer knew of this arrangement, but none that the bank did. The defendant professed to believe that he was only a co-signer, a contention not supported by the documents signed by him. The district court, nevertheless, held the debt to be dischargeable, stating that "(a) good faith belief, even though unreasonable, precludes a wilful and malicious intent." 8 B.R. at 293 This court has declared its allegiance to this standard in *Matter of Lewis*, 17 B.R. 46, 48, 49 (Bkrtcy.W.D.Ark.1981), and other cases. Other courts have dissented from the view. See, e.g., *United Bank of Southgate v. Nelson*, 35 B.R. 766, 772, 776, 777 (N.D.Ill.1983); *In re DeRosa*, 20 B.R. 307, 313 (Bkrtcy.S.D.N.Y.1982) ("This court is persuaded by ... the looser ... common-law definition of implied or constructive malice, rather than the rigid standard of actual, subjective, conscious intent to harm as enunciated in *Lewis.*")

**4.** Cf. note 2, *supra*. By reason of the findings of fact and conclusions of law herein made, the other grounds for denial of discharge, as based on the evidence adduced in the hearing of this action, and based on the asserted ground that the debtors concealed or removed property or failed to explain its disappearance, must also be denied.

the proceeds in the operation. It is therefore

ORDERED, ADJUDGED AND DECREED that the within complaint be, and it is hereby, denied.