In the Matter of Robert T. McCUNE and Pamela J. McCune, Debtors.

AMERICAN BANK OF RAYTOWN, Plaintiff,

v.

Robert T. McCUNE and Pamela J. McCune, Defendants.

Bankruptcy No. 86–01840–3.
Adv. No. 86–0497–3.

United States Bankruptcy Court,
W.D. Missouri, W.D.

March 20, 1987.
Order Reversed May 4, 1988.

Jeff A. VanZandt, Shockley, Reid & Tyson, Kansas City, Mo., for plaintiff.

James H. Thompson, Jr., North Kansas City, Mo., for defendants/debtors.

MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING FINAL DECREE OF DISCHARGEABILITY OF ANY CLAIM AGAINST ROBERT T. McCUNE AND NONDISCHARGEABILITY OF CLAIM AGAINST PAMELA J. McCUNE IN THE SUM OF $3,191.39 PLUS INTEREST AND JUDGMENT THEREFOR

DENNIS J. STEWART, Chief Judge.

 This action is one in which the plaintiff seeks a decree of nondischargeability of the defendants' alleged indebtednesses to it on the ground of willful and malicious conversion within the meaning of section 523(a)(6) of the Bankruptcy Code. The action came on before the bankruptcy court for trial of its merits on the dates of March 2, 1987, and March 10, 1987, in Kansas City, Missouri. The parties then appeared by respective counsel. The evidence adduced warrants the following findings of fact.

1. The plaintiff had, at all times here in question, a valid and perfected security interest in the personal property in question, which is further described in the marginal note.[1]

2. The security instrument which defines the relevant rights of the parties to this action clearly and unabmiguously provides that the debtor Pamela J. McCune shall not sell or otherwise dispose of the personal property in question without the consent of the plaintiff.[2]

3. The defendant Robert T. McCune was not a party to the security agreement and does not claim any interest in the personal property here in question and no evidence has been adduced which would demonstrate that the defendant Robert T. McCune participated in the conversion or enjoyed the benefits thereof.[3]

4. The defendant Pamela J. McCune sold the personal property in question and did not seek or receive the permission of the plaintiff to do so and did not turn over any of the proceeds of sale to the plaintiff.[4]

5. At the time of the sale of the personal property in question, the evidence before the court shows that the personal property disposed of had a value of $4,019.00.[5]

6. The defendant Pamela J. McCune bases her claim that any conversion of the plaintiff's property was not wilful and malicious within the meaning of section 523(a)(6) of the Bankruptcy Code on the fact that the plaintiff first required her to submit the certificates of title to it and then later returned those certificates of title without explanation. From this, she concluded that the plaintiff was no

1. The subject personal property is described as a 1983 Chetah 16 ft. Fiberglas Outboard Boat and a 1983 Marina Outboard Motor.

2. The security agreement relevantly provides that: "I won't sell, transfer, lease or give the collateral to anyone else, except that I may sell inventory in the ordinary course of business."

3. The court accordingly issued its oral order at the conclusion of the hearing of March 10, 1987, dismissing this action with respect to the defendant Robert T. McCune.

4. These facts are so, according to the uncontradicted evidence.

5. This was the purchase price of the articles in question when they were purchased on October 13, 1983. The evidence shows that they were sold, according to Pamela J. McCune's testimony, "in 1983 or 1984." There is no evidence of any drop in value of the property between the time of purchase and the time of sale.

longer claiming a security interest in these particular chattels. Accordingly, she states that she believed herself not bound by the terms of the security agreement and that she could dispose of the property on her own account without paying any of the. proceeds to the plaintiff. Plaintiff returned the certificates of title to the defendant Pamela J. McCune because it had determined that holding the certificate of title did not constitute perfection of the security interest according to the law of Missouri; that it was necessary, instead, to file financing statements as required by section 400.9–401 RSMo.[6]

### Conclusions of Law

■ Section 523(a)(6) of the Bankruptcy Code provides that a liability created by a wilful and malicious injury to the property of another, including conversion of that property, is not dischargeable in bankruptcy. In order to be entitled to a decree of nondischargeability under this section, plaintiff must show[7] both (1) that the defendant is guilty of a conversion and (2) that the conversion was accomplished wilfully and maliciously.

In determining whether a conversion has been committed, the standard is whether the defendant hs clearly exercised dominion over the chattel in a manner which is contrary to the plaintiff's claim of ownership or right to possession. "Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's right." *Houston v. Columbia Fed. Sav. & Loan Assn.*, 569 S.W.2d 211, 214 (Mo.App. 1978). "The law of conversion is concerned with possession, not title, and its essence is not in the acquisition of the property by the wrongdoer, but in the wrongful deprivation of it to the owner. There need only be some repudiation of the owner's right or some exercise of dominion over it inconsistent with some right." *Price v. Ford Motor Credit Co.*, 530 S.W.2d 249, 255 (Mo.App. 1975). "Proof of conversion can be shown either by: (1) a tortious taking, or (2) by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the rights of the owner, or (3) by a refusal to give up possession to the owner on demand." *Houston v. Columbia Fed. Sav. & Loan Assn., supra,* at 214; *Arnold v. Prange,* 541 S.W.2d 27, 30 (Mo.App.1976). The authorities clearly hold that selling or otherwise disposing of secured property without permission of the mortgagee constitutes a conversion. See, e.g., *Commercial Credit Corp. v. Joplin Automobile Auction Co.,* 430 S.W.2d 440, 444 (Mo.App.1968); *United States v. Gallatin Livestock Auction, Inc.,* 448 F.Supp. 616 (W.D.Mo.1978), affirmed, 589 F.2d 353 (8th Cir.1979); *United States v. Chappell Livestock Auction, Inc.,* 523 F.2d 840, 842 (8th Cir.1975).

■ In determining whether a particular defendant is liable for a conversion, the criterion is whether that defendant either participated in the conversion or benefitted from it. "Every person is liable in trover who personally or by agent ... commits an act of conversion or who participates in the conversion by instigating, aiding or assisting another, or who knowingly benefits from its proceeds in whole or part." 89 C.J.S. *Trover and Conversion* section 77, pp. 575, 576 (1955); *Darling & Co. v. Fry,* 24 S.W.2d 722, 724 (Mo.App.1930); *Coleman v. Pioneer Studebaker, Inc.,* 403 S.W.2d 948, 952 (Mo.App.1966); *Matter of Anderson,* 15 B.R. 346, 350 (Bkrtcy.W.D. Mo.1981). In this action, as found above, there is no evidence that the defendant

---

**6.** Effective April 1, 1986, section 306.400 RSMo provides that: "A lien or encumbrance on an outboard motor, motorboat, vessel or watercraft is perfected by the delivery to the director of revenue, by the owner, of the existing certificate of ownership, if any, an application for a certificate of ownership containing the name and address of the lienholder and the date of his security agreement, and the required certificate of ownership fee." No specific provision was therebefore made with respect to perfection of security interests in watercraft. Therefore, presumably, filing of financing statements according to section 400.9–401 RSMo. was sufficient.

**7.** By a preponderance of the evidence. See *Matter of Curl,* 49 B.R. 302, 304 n. 6 (Bkrtcy.W.D. Mo.1985).

Robert T. McCune either participated in or enjoyed the benefits of the conversion.[8] Accordingly, no judgment can be entered against him and there is accordingly therefore no basis for a decree of nondischargeability with respect to the defendant Robert T. McCune.

"A claim founded on a mere technical conversion without conscious intent to violate the rights of another, and under mistake or misapprehension, is dischargeable." 3 Collier on Bankruptcy para. 523.16, p. 523–117 (15th ed. 1986). In determining whether a conversion is willful and malicious within the meaning of section 523(a)(6), *supra,* a range of definitions has historically been employed. One definition of "willful and malicious" which is applied is the "legal malice" or "objective" definition. "(A) wrongful act done intentionally, which necessarily produces harm and is without just cause or execuse, may constitute a willful and malicious injury.... Thus, the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is a willful and malicious injury within the exception." 1A Collier on Bankruptcy para. 17.17, pp. 1652, 1653, 1654 (14th ed. 1976). See also to the same effect 3 Collier on Bankruptcy para. 523.16, pp. 523–111, 523–112 (15th ed. 1986). At the other end of the spectrum is the "actual malice" or "subjective" standard. "(W)hen a defendant has disposed of collateral without permission but with some notion, however erroneous it would appear to be, that he has a right to dispose of it, there can be no finding of willful and malicious conversion." *Matter of Lewis,* 17 B.R. 46, 48 (Bkrtcy.W.D.Ark.1981). "There must be an 'intent to do harm.'" *Matter of Nelson,* 10 B.R. 691, 692 (Bkrtcy. N.D.Ill.1981). Between these antipodes the decisions shifted even under the pre–1979 Bankruptcy Act. "A claim or judgment based merely upon negligence does not necessarily constitute a willful and malicious injury within the exception, even if the negligence is alleged to be reckless and wanton. The opposite result will be reached, of course, where the alleged negligence is founded upon a willful and malicious act. The cases shade imperceptively from one group to another." 1A Collier on Bankruptcy para. 17.17, pp. 1656, 1658, 1659 (14th ed. 1976). When the Bankruptcy Reform Act of 1978 came into effect on October 1, 1979, its explicit refusal to consider "reckless disregard" as a substitute for intention appeared to give early impetus to the subjective standard.[9] The pioneer cases under the new Code focussed on a frankly "subjective" definition [10] which refused to grant a decree of nondischargeability unless a definite "intent to harm" the secured creditor were shown.[11] If there was any ambiguity in the governing security agreement or the surrounding circumstances from which it could be inferred that the debtor had no "intent to harm" the secured creditor, then an innocent subjec-

**8.** See note 3, *supra.*

**9.** See House Report No. 95–595, 95th Cong., 1st Sess. 363 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787 to the following effect: "Paragraph (6) (of section 523(a)) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, 'willful' means deliberate or intentional. To the extent that *Tinker v. Colwell,* 139 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1902), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a 'reckless disregard' standard, they are overruled."

**10.** "(T)he decisions have gone to the extreme of requiring proof of such an intention by means of a rigid subjective standard, under which the debtor's conversions are excused if he has a good faith, albeit unreasonable, belief that he has a right to deal with the property as his own." *Matter of Ireland,* 49 B.R. 269, 271 (Bkrtcy.W.D.Mo.1985).

**11.** "(M)alice must encompass 'an intent to harm' the creditor." *In re Hodges,* 4 B.R. 513, 516 (Bkrtcy.W.D.Va.1980). "When the injury is directly to a person or to the property of another, a standard of intentional harm is understandable ... But when the injury is conversion of secured property such a standard virtually renders the remedy meaningless. Under what circumstances, for instance, would a debtor ever sell secured property out of malice? ... Nevertheless, I believe the *Hodges* case correctly reads the intent of Congress, and this Court will follow it in the absence of a binding appellate decision to the contrary." *Matter of Nelson,* 10 B.R. 691, 692 (Bkrtcy.N.D.Ill.1981).

tive intention was required to be inferred.[12] At length, some decisions rejected this standard and returned to the "legal malice" standard on the basis of a recognition that the "subjective" standards were in most imaginable cases impossible to meet. See, e.g., *United Bank of Southgate v. Nelson*, 35 B.R. 766, 773 (N.D.Ill.1983) ("In more recent case law, dissatisfaction with the (subjective) standard has led to a marked tendency by the courts to follow the intentional and deliberate definition of willful, but to strain to avoid what they view as the harsh and unfair results of the 'intent to do harm' definition of malice. In general these cases seek to circumvent the apparent Congressional intent to obviate the (objective) standard and to apply the implied or constructive malice standard to the malicious requirement."); *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009, 1010 (4th Cir.1985) ("To require specific malice or some other strict standard of malice for nondischargeability of a debt under the Bankruptcy Code would undermine the purposes of that provision and place 'a nearly impossible burden' on a creditor who wishes to show that a debtor intended to do him harm ... To require such specific malice would restrict section 523(a)(6) to the small set of cases where the debtor was foolhardy enough to make some plainly malevolent utterance expresssing his intent to injure his creditor ... Under the facts of this case, Vaughn acted toward St. Paul 'deliberately and intentionally in knowing disregard of the rights of another.' ").

 In our circuit, the Court of Appeals has developed a cautious and fair middle-ground standard which tests whether the debtor's conduct was of a type which was, or should have been recognized to be, certain to cause harm to the secured creditor. "When transfers in breach of security agreements are in issue, we believe nondischargeability turns on whether the conduct is (1) headstrong and knowing ('willful') and (2) targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause

financial harm." *In re Long*, 774 F.2d 875, 881 (8th Cir.1985). Under this rule, a debtor is charged with knowledge of the natural consequences of his or her actions. "While intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent. Use of objective information to ascertain intent to cause harm is by no means unfamiliar." *In re Long*, *supra*, at 881, citing *Bogard v. Cook*, 586 F.2d 399, 412 (5th Cir.1978), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979), in which it is said: "we read the malicious intent prong ... to require proof that (a defendant) either actually intended to do harm to the plaintiff, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result." This court reads the *Long* decision, *supra*, to work a substantial alteration in the law whereby the former "subjective" standard is no longer followed and a more salutary rule is to be employed whereby the debtor is responsible for the natural effect of his or her actions. Thus, in the action at bar, the ambiguity inserted into the situation by the plaintiff's returning the certificates of title may well have precluded any finding of "willful and malicious" intention under the former rule which measured the action *only* by the *subjective* claim of good faith behind it. Now, however, the court is obliged to assess whether the debtor knew or should have known that the conversion would cause harm to the plaintiff. In this case, there was no indication that the security agreement itself was cancelled and returned to the defendant Pamela J. McCune, nor that she made any inquiry to discover whether the return of the certificates was the equivalent of such cancellation. Had she inquired, she would have discovered that the plaintiff claimed a perfected security interest by reason of the filing of the financing statements. And, further, in this case, the court is faced with the aphorism which has some universal applicability in all litigation—ignorantia legis

---

**12.** See, e.g., *Matter of Ireland*, 49 B.R. 269, 271 (Bkrtcy.W.D.Mo.1985).

neminem excusat ("Ignorance of the law excuses no one."). Under that principle, Mrs. McCune was bound to know of the existence of a perfected security interest. Accordingly, under the standards stated in *In re Long, supra,* the court holds that the indebtedness of Pamela J. McCune to plaintiff was nondischargeable in a sum equal to the value of the collateral at the time and place of its sale.[13]

It is therefore determined that the indebtedness to plaintiff of Pamela J. McCune in the sum of $3,191.39 plus interest at 9% per annum from January 1, 1984,[14] is nondischargeable in bankruptcy and that judgment should issue therefor. The complaint should be dismissed with respect to the other defendant, Robert T. McCune.

---

**13.** The value of the collateral as of the time and place of the sale was $4019. See note 5, *supra.* But the plaintiff's interest in that collateral must be bounded by the balance due it, $3,191.39.

**14.** The evidence shows that the defendant Pamela J. McCune testified that she had sold the collateral "in 1983 or 1984." The evidence accordingly warrants a finding of January 1, 1984, as the time of the sale.