In re Charles W. PADGETT and Patsy A. Padgett, Debtors.

BANCFIRST, formerly First National Bank of Seminole, Seminole, Oklahoma, Plaintiff,

v.

Charles W. PADGETT, Defendant.

Bankruptcy No. 89–70139.
Adv. No. 89–7025.

United States Bankruptcy Court,
E.D. Oklahoma.

Sept. 25, 1989.

Larry J. McMains, Seminole, Okl., for plaintiff.

Sidney K. Swinson, Tulsa, Okl., for defendant.

## ORDER

JAMES E. RYAN, Bankruptcy Judge.

On September 12, 1989, Trial was conducted upon the timely filed Complaint of BancFirst, formerly First National Bank of Seminole, Seminole, Oklahoma, to determine whether Charles W. Padgett, the Debtor, violated 11 U.S.C. § 523(a)(6) by using the proceeds received from the sale of Plaintiff's collateral to pay the current operating expenses of Debtor's wholly owned automobile agency.

Larry J. McMains appeared for Plaintiff with Sidney K. Swinson appearing in behalf of Defendant.

Upon and in consideration of the Pre–Trial Order of September 5, 1989, the Joint Stipulations of Fact by counsel, the evidence received, the legal arguments and the law of the case, this Order shall be entered in this core proceeding in compliance with B.R. 7052.

## FINDINGS OF FACT

1. Defendant, Patsy A. Padgett, was dismissed from this action July 10, 1989, upon Motion of Plaintiff.

2. Debtor had more than fifteen (15) years experience in the new and used car sales business when he purchased an interest in the predecessor of Charles Padgett Motor Company, Inc. (Company). Since 1985, Debtor has been President, Chief Operating Officer and sole shareholder, as well as being the only person handling the Company's obligations with First National Bank of Seminole (Creditor).

3. Debtor as President at various times beginning December 3, 1987 through June 6, 1988 executed fourteen (14) Promissory Notes and Security Agreements with Creditor, each financing the purchase of one used vehicle to be resold by Company. All obligations were personally guaranteed and executed in accord with a Floor Plan Agreement of November, 1985, which contained a credit limit of $100,000.

4. In late 1987, Debtor was made aware of the Company's short cash flow position and he, within thirty (30) days, began to seek outside financing. However, Debtor testified he limited his avenues of capital pursuit to the non-commercial and non-established financial sources, with his pursuit being directed exclusively toward the very speculative and high risk "money finders."

5. In March, 1988, Debtor paid $1,000 for introduction to a person in Dallas, Texas who reportedly felt he could obtain $3,000,000 for Debtor's benefit. However, he refused to disclose the source of this financing. Debtor, upon numerous attempts to follow up regarding the loan status received the truly classic example of the money finders' modus operandi; that is, the individual supposedly seeking the big loan almost always replied, "everything is OK and the money should be coming any day."

6. Debtor, as an agent for Company, began liquidating out of the ordinary course of business his used car inventory encumbered by the Security Agreements in January, 1988, which was immediately discovered by Creditor during its quarterly Floor Plan check in January. During the first six months of 1988, Debtor as President of Company, was financing a used car inventory and within not more than thirty (30) days of the extension of credit, he would sell the particular vehicle and use the proceeds to pay current debt service to Creditor on other notes, as well as current operating expense. None of the proceeds were used for Debtor's personal, family or household expenses.

7. Debtor's acts of using proceeds received from the sale of Creditor's collateral were "willful" as conceded in the Pre–Trial Order.

8. Creditor, by its Complaint, seeks only a determination from this Court that the Floor Plan obligation be excepted from Debtor's discharge in Case No. 89–70139.

## CONCLUSIONS OF LAW

A. The initial issue which this Court raises on its own inquiry concerns whether the Debtor/Defendant may be held individually and personally liable for acts committed by the Debtor as President of the corporation, the Charles Padgett Motor Company. The Debtor signed the Security Agreements with Plaintiff in his capacity as President of the corporation, and executed a separate Guaranty Agreement individually.

In Oklahoma, Courts have determined that an officer of a corporation can be personally liable for the wrongful use of funds entrusted to it if the officer was negligent in his duties as corporate officer. *ITT Industrial Credit Co. v. L–P Gas Equipment, Inc.*, 453 F.Supp. 671, 677 (W.D.Okla.1978) citing authority in *Schroeder v. Sanford–Felt Investments Co.*, 177 Okl. 54, 57 P.2d 601 (1936) and *Preston–Thomas Construction, Inc. v. Central Leasing Corporation*, 518 P.2d 1125 (Okla. Ct.App.1973). Since it is admitted that the Debtor sold corporate assets encumbered by the lien of the Plaintiff out of trust, the Debtor may be held personally liable for his acts. We need not address the liability stemming from the Guaranty Agreement.

B. The basis for the action brought by the Plaintiff in this case is founded in 11 U.S.C. § 523(a)(6) which states:

A discharge under § 727 ... of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Thus, the Plaintiff bringing the action has the burden of proof for the two elements of this section, "wilfulness" and "maliciousness" by clear and convincing evidence. *In re McGinnis*, 586 F.2d 162, 163 (10th Cir.1978) and *In re Auto Outlet, Inc.*, 71 B.R. 674, 677 (Bankr.D.Utah 1987).

C. *WILLFUL CONDUCT*—The requirement that the conduct be "willful" has been defined as "conduct that is volitional and deliberate and over which the debtor exercises meaningful control, as opposed to unintentional or accidental conduct." *In re Posta*, 866 F.2d 364, 367 (10th Cir.1989) citing *In re Clayburn*, 67 B.R. 522, 525 (Bankr.N.D.Ohio 1986); *In re Nelson*, 67 B.R. 491, 497 (Bankr.D.Minn.1985). This willful conduct may also be described as "headstrong and knowing" thus affirmatively eliminating any unforeseeable acts caused by negligence. *In re Long*, 774 F.2d 875, 881 (8th Cir.1985).

In the instant case, little doubt exists that the Debtor, in his capacity as President of the corporation and sole shareholder, intentionally and therefore willfully failed to remit to the Plaintiff the proceeds derived from the sale of the subject vehicles. The Pre–Trial Order executed by both parties and superceding all prior pleadings filed in the case states that the subject vehicles were sold out of trust by the corporation owned, operated and controlled by the Debtor. The proceeds from the sale were deposited into the bank account in the control of the corporation and were not remitted to the Plaintiff in compliance with the Security Agreement. Thus, sufficient facts have been admitted in the Pre–Trial Order to find that the Debtor acted willfully.

D. *MALICIOUS CONDUCT*—In addition to being willful, the conduct of the Debtor must be of such a degree as to constitute "malicious" under the requirements of § 523(a)(6). Much controversy has arisen regarding the interpretation of the "malicious" standard intended by Congress to deny dischargeability under the Code. The Tenth Circuit has stated that "the focus of the 'malicious' inquiry is on the debtor's actual knowledge or the reasonable foreseeability that his conduct will result in injury to the creditor, 'not on abstract and perhaps moralistic notions of the "wrongfulness" of the debtor's act'." *In re Posta*, supra, at p. 367. Further, "malicious intent must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights. *In re Nelson*, 67 B.R. at 497; *In re Dever*, 49 B.R. 329, 332 (Bankr.W.D.Kentucky 1984). Such knowl-

edge can be inferred from the debtor's experience in the business, his concealment of the sale, or by his admission that he has read and understood the security agreement. *In re Cullen*, 71 B.R. 274, 282 (Bankr.W.D.Wisc.1987); *In re Gantt*, 56 B.R. 852, 857 (Bankr.E.D.Va.1985); *United Bank of Southgate v. Nelson*, 35 B.R. 766, 776 (Bankr.N.D.Ill.1983)." *In re Posta*, supra at p. 367–68. Other Courts have found that the conduct must be "targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm." *In re Long*, supra at p. 881.

This Court interprets the reasoning of the Tenth Circuit in that when analyzing for the "malicious" element, one must necessarily consider exigent circumstances with regard to the debtor in such areas as his ability, knowledge and other conditions which might temper a finding of "maliciousness." Malice is necessarily a result-oriented determination. An examination of the resulting injury from the conduct of the debtor must be found. By failing to remit the proceeds in conformity with the Security Agreement, the Plaintiff clearly sustained an economic injury resulting from the Debtor's behavior. In addition, the evidence bears out a conclusion that the Debtor is a sophisticated businessman, having been in the business of selling automobiles for sometime. The Debtor admits that he read and understood his obligations under the Security Agreement with the Plaintiff and yet did not remit the proceeds from the sale of the subject vehicles to the Plaintiff as required. Further, some evidence was presented to this Court indicating that the Debtor concealed the sale of a portion of the vehicles upon inquiry from the Plaintiff. As a result of these findings and conclusions, we find that the actions of the Debtor were indeed "malicious" as required by the Bankruptcy Code.

E. The facts in the instant case are completely distinguishable from the most recent pronouncements from the Tenth Circuit on this issue. See *In re Posta*, supra, and *In re Compos*, 768 F.2d 1155 (10th Cir.1985). The *Compos* case involved a debt arising from an automobile accident which occurred while the debtor was intoxicated. The Court found that the actions of the debtor were not "willful and malicious." However, this case involved a matter of social concern which was remedied by later legislation resulting in 11 U.S.C. § 523(a)(9).

The *Posta* case involved the sale by the debtors of a mobile home in which a creditor possessed a security interest. The proceeds from the sale were not remitted to the creditor. However, the Court found the actions of the debtors were not "willful and malicious," finding numerous extenuating circumstances, including the lack of sophistication of the debtors, the failure of the debtors to read and understand the security agreement and the fact the debtors did not wilfully disregard the rights of the creditor. These extenuating circumstances do not exist in the case currently before this Court.

Thus, while the standard for analysis may be derived from these cases, the application of that standard results in quite the opposite conclusion due to the facts of this case.

F. The Debtor wishes this Court to find that he was justified in the retention of the proceeds due to the necessity of their use to keep the business afloat pending the securing of additional financing for the corporation. The Debtor's actions might be justified under the correct set of facts wherein it was necessary to utilize the proceeds for the preservation of the Plaintiff's collateral. But upon the Debtor discovering the decline in his business, it is incumbent upon him to notify the Creditor of these problems, giving the Creditor the option of taking possession of the collateral.

In the instant case, the Debtor testified that he discovered that his expenses were exceeding his income in late 1987 and began attempting to obtain financing in January of 1988. This was precisely the time that the Debtor was disposing of the collateral and retaining the proceeds without communicating these problems to the Plaintiff. We cannot find that the actions of the Debtor were justified. The avenues taken

by the Debtor to obtain financing through the "money finders" were not at all conventional and were of questionable judgment at best. Debtor, by limiting his pursuit to a true gamble and not the established financial market, indicates his recognition of the extreme risk of imminent failure of his company. This implicit recognition increases Debtor's burden to protect his creditors from harm. Under the circumstances, we cannot allow the Debtor to force the Creditor to participate in the business as a joint venturer, risking the Creditor's entire investment with the Debtor. This was not a risk the Creditor assumed in bargaining the Floor Plan with the Debtor. As such, the Debtor's argued justification must fail.

IT IS THEREFORE ORDERED that the obligation owed by the Defendant to the Plaintiff is rendered nondischargeable pursuant to 11 U.S.C. § 523(a)(6) for the reasons set forth hereinabove.