In the Matter of Herbert Glenn REMICK, and Lesalie Raye Remick, d/b/a Remick Radio, Inc., KLES Radio, Debtors.

Jerry HERMAN, Richard Adler, d/b/a Richard Adler Music, Judith Coulter and Janie Coulter Hartbarger, d/b/a J & J Ross Co., Shapiro Bernstein & Co., Inc., SCP Music Corp., Morley Music Co., CBS Feist Catalog, Inc., CBS Miller Catalog, Inc., CBS U Catalog, Inc., Barwin Music, Inc., Chappell & Co., Inc., Producers Music Publishing Co., Inc., Leeds Music Corporation, New World Music Corp., Mills Music, Inc., T.B. Harms Company, Jobete Music Co., Inc., Songfest Music Corp., MCA, Inc., Bourne Co., World Music, Inc., Hallmark Music Company, Inc., Famous Music Corporation, Harwin Music Corporation and Hampshire House Publishing Corporation, Plaintiffs,

v.

Herbert Glenn REMICK, and Lesalie Raye Remick, Defendants.

Bankruptcy No. 86–04776–SW.

Adv. No. 87–0050–SW.

United States Bankruptcy Court, W.D. Missouri, Southwestern Division.

Nov. 18, 1987.

Final Judgment April 4, 1988.

Stacy Obenhaus, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiffs.

Robert R. Parrish, Joplin, Mo., for defendants.

MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING FINAL DECREE OF NONDISCHARGEABILITY OF A PORTION OF THE INDEBTEDNESS OF DEFENDANT HERBERT G. REMICK TO PLAINTIFF AND SETTING HEARING ON ISSUE OF STATUTORY DAMAGES

DENNIS J. STEWART, Chief Judge.

This action is one in which the plaintiff seeks a decree of nondischargeability of

the defendants' alleged indebtedness to it on the ground of willful and malicious injury to property within the meaning of § 523(a)(6) of the Bankruptcy Code. The action came on before the bankruptcy court for trial of its merits on the date of June 26, 1987, in Joplin, Missouri. The parties then appeared by respective counsel. The evidence adduced warrants the following findings of fact.

1. The plaintiffs were, at all times here in question, the franchisors of certain musical programs which are the subjects of copyrights. The defendants entered into a franchise agreement with the plaintiffs, under which, for periodic payments, the defendants were to be permitted to play the musical compositions, in which plaintiffs held their copyright, on the defendants' radio station.

2. The instrument which defines the relevant rights of the parties to this action clearly and unambiguously provides that the debtors' right to make use of the copyrighted compositions is dependent upon their making timely payments to the plaintiffs.[1]

3. The defendants were both in managerial positions of control in the radio station, but it was the defendant Herbert G. Remick who acted as chief executive officer and who exercised predominant control of the radio station's operations, particularly with respect to the playing of the compositions which comprise the subject matter of this action. His wife, the defendant Lesalie R. Remick, was part owner—with Herbert G. Remick—of the radio station and was also a manager, but the evidence shows her position to have been subordinate to that of Herbert G. Remick. She stated in her testimony that she did know that the musical compositions which were played were "basically middle of the road nostalgia" and "basically what the previous management had done."

4. The defendants initially made the payments to plaintiffs which were required by the governing franchise agreement in order to keep it in effect. Ultimately, however, the defendants failed to make the requisite payments.[2]

5. The plaintiffs therefore terminated the franchise agreement and sent repeated written notices to the defendants alluding to the necessity of making payments as the prerequisite to continuing to play the music which was supplied by the plaintiffs according to the agreement.[3]

---

1. Paragraph 8 of that agreement provides:

"Upon any breach or default by Licensee of any terms herein contained relating to the reports, accountings or payments required to be made by Licensee, Society may give Licensee thirty (30) days' notice in writing to cure such breach or default, and in the event that such breach or default has not been cured within said thirty (30) days, Society may then promptly terminate this license."

2. According to the testimony of the plaintiffs' witness Lloyd Grant Reedstrom, the defendants ultimately, in 1985, "became" delinquent in their payments to plaintiffs.

3. The documentary evidence which was adduced in this case shows the following contents of the following letters on the following dates:

(a) January 23, 1986:

"In his phone conversation with you of December 6, our Station Representative, Lloyd Reedstrom, reported to me that you anticipated additional financing within a week to ten days for Radio Station KLES. If this financing was to transpire, it would allow you to pay your entire balance by this past Christmas. Mr. Reedstrom also informed me that if it does not transpire that, you would contact either myself or Mr. Reedstrom.

"Nearly eight weeks has elasped [sic] since this conversation with Mr. Reedstrom, however, and no payment has been received nor have we received any word from you regarding the arrangement of a liquidation agreement. The balance for Radio Station KLES has now increased to $5,346.83, subject to audit through January 1986.

"I am sure that you will agree that we have been extremely patient with you on this matter. However, we will no longer extend to you any further credit. On January 22, 1986, I sent certified notice (a copy of which is enclosed) giving you an additional thirty (30) days in which to cure this substantial default. Failing that, the license for KLES will be terminated."

(b) February 11, 1986:

"I have received your letter of February 6 in response to my letter of January 23 concerning the potential termination of the KLES license.

"As you noted, I have extended my patience about all that I can regarding your lack of response to my prior correspondence and the continuing delinquency of the KLES account.

6. These letters were received and read by the defendant Herbert G. Remick, but, according to the uncontradicted and credible testimony of record, the defendant Lesalie R. Remick did not receive or read any of the letters. There is, further, no evidence before the court that Herbert G. Remick apprised Lesalie R. Remick of the reception or the content of any of the letters. The evidence only shows that the defendants generally discussed business matters periodically.

7. On October 31, 1985, a representative of the plaintiffs met with the defendant Herbert G. Remick. According to his testimony respecting the discussion during this meeting, he principally informed Mr. Remick of the necessity for updating payments pursuant to the franchise agreement.[4] The defendant Lesalie R. Remick was not present at this meeting.

8. Ultimately, on August 7, 1986, the plaintiffs, by letter to the following effect, unequivocally advised the defendant Herbert G. Remick of the termination of the franchise agreement and that the copyrighted compositions were no longer to be played on the air.

> Under the circumstances, I will continue to work with you to clear the KLES delinquency and bring the account current. However, I must insist that we receive the complete payment plan which you indicated in your letter you had sent, on March 1, 1986, *no later than March 8, 1986.*
>
> "Failing that, the license for station KLES will be terminated. Your cooperation will be appreciated."
>
> (c) March 11, 1986:
>
> "In your letter to me of February 6, you informed me that you would send me a complete payment plan on March 1, 1986. I responded by writing to you that we must receive this complete payment plan no later than March 8, 1986.
>
> "It is now past March 8, 1986. We have received no payment plan from you and no payments on the KLES account. The balance is now increased to $5,817.16, subject to audit, as of March 1, 1986. This figure is in excess of fifteen past due monthly charges.
>
> "Under the circumstances, I have no alternative but to forward to you certified notice (a copy which I have enclosed) informing that the license for station KLES has been terminated. Any performances of copyrighted musical compositions in the Society's repertory without advance permission from the respective members concerned will constitute infringements of the respective copyright. If such infringing performances are given, appropriate steps will be taken under the United States Copyright Law to obtain redress."
>
> (d) March 24, 1986:
>
> "To confirm our conversation of March 18, you informed me that you expected to receive credits as a result of your 1985 annual report. You also informed me that you were also in the process of negotiating new financing for the station to clear the past due balance with ASCAP. I informed you that I would send you additional annual report forms (which were sent on March 18th) and that I would hold off on any further action pending receipt of your 1985 annual report, the credit adjustments resulting from the report *and* your firm committment [sic] to a specific payment plan.
>
> "In the course of our conversation, you conceded that your communication with ASCAP as regards this delinquency has been less than desired. In fact, with the exception of your conversations with our Station Relation Representative, Lloyd Reedstrom until I sent you the notice giving you thirty days in which to cure the default, your communication with me has been nonexistent. Our records indicate that Radio Station KLES owes the Society a balance through March of $6,190.16, subject to audit.
>
> "I understand your situation and I am willing to work with you to cure this default. However, you should understand the situation at ASCAP and be appreciative of the fact that I had not heard from you in this matter and that you had not paid ASCAP since April 30, 1985. Accordingly, once the expected credit adjustments are made to the KLES account as a result of the 1985 annual report, you *must* then agree to a payment plan to cure this delinquency.
>
> "Meanwhile, Radio Station KLES remains unlicensed to perform copyrighted musical compositions in the Society's repertory. Any such performances, without advance permission from the respective members concerned will constitute infringement of the respective copyrights. If such infringing performances are given, appropriate steps will be taken under the United States Copyright Law to obtain redress. Your cooperation will be appreciated."

It must be observed that, in none of these letters, was the contract unequivocally terminated. Even the letter of March 24, 1986, remains arguably ambiguous in not designating the compositions as to which performances will be considered to constitute infringement. Further, it adverts to a potential future agreement which might well obviate any past infringement.

4. These facts are so, according to the uncontradicted evidence, which is to the effect that only Lloyd Reedstrom and the defendant Herbert G. Remick were involved in this conversation.

"In my telephone conversation with you on Friday, July 25, you informed me that you would call me no later than next Wednesday (July 30, 1986) and report to me as to your progress in the sale of the station. I telephoned you on Monday, August 4, however, I was informed that you were in a conference. I left a message with the expectation that you would call back. However, I have not heard from you.

"As you know, Radio Station KLES has not been licensed by ASCAP since the license was terminated for breach and default by certified notice dated March 10, 1986. Despite advice that performances of copyrighted musical compositions in the Society's repertory would constitute infringements of copyright if rendered without permission, tape recordings made of the stations's broadcasts disclosed evidence of many works in the ASCAP repertory, including:

ROSES ARE RED

THREE COINS IN THE FOUNTAIN

BECAUSE YOU'RE MINE

LAZY BONES

MY ROMANCE

YOU'VE CHANGED

I DIDN'T KNOW WHAT TIME IT WAS

WITHOUT A SONG

WRAP YOUR TROUBLE IN DREAMS

I'LL WALK ALONE

"Under the circumstances, these performances constitute infringements of copyright.

"We are prepared to resolve claims for infringement arising from these and other unauthorized performances on the basis of retroactive licensing and payment of license fees. If you wish to proceed on this basis, you must now submit all items that would be due if licensed to date.

"Our records show that if licensed to date, Radio Station KLES would owe the Society, subject to audit as of August 1, 1986, $7,678.48.

"This offer will remain open for ten (10) days. If the items requested are received within that period, we will reinstate the license retroactive to the date of termination.

"ASCAP has incurred out-of-pocket expenses of $527.46 in obtaining evidence of these infringing performances. If we do not receive the items requested above within ten (10) days, we shall withdraw this offer and refer claims to counsel. If that is necessary, we shall seek reimbursement of all of our expenses including taping costs and attorney's fees, if infringement claims are subsequently to be resolved on the basis of retroactive licensing.

"I trust that you will take advantage of our proposal and submit all items called for within the ten (10) day period."

9. As to this letter, there is nothing in the evidence before the court from which it can be inferred that it was shown to the defendant Lesalie R. Remick or that any of its substance was communicated to her.[5]

10. The evidence is to the effect that musical compositions were continued to be played on the defendants' radio station after the date of reception of the letter referred to in paragraph 8, *supra*, but there is no evidence from which the court can ascertain the value of the infringements which took place after that date.[6]

---

5. See the evidence summarized, *infra*, in the text of the conclusions of law.

6. Plaintiffs, in the course of their briefing of the action at bar, advert to the principle that damages are presumed from any copyright infringement. But this principle cannot be sufficient, without some evidence, to permit the court to make a finding of *how much* in damages may be attributed to *willful* and *malicious* infringement. The court may, however, award damages which are totally statutory and totally discretionary. "[T]he district court is required to apply the mandatory statutory damage provisions where there is no evidence of the amount of damages." *Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc.,* 367 F.2d 236, 241 (9th Cir. 1966). That statutory scheme provides for $250 to $10,000 damages against each infringer per infringement "as the court considers just," § 504(c)(1), Title 17, United States Code, and additionally, when the infringement was willful, "the court in its discretion may increase the award of statutory damages to a sum of not more than $50,000." § 504(c)(2) of the same

## Conclusions of Law

Section 523(a)(6) of the Bankruptcy Code provides that a liability created by a willful and malicious injury to the property of another is not dischargeable in bankruptcy. In order to be entitled to a decree of non-dischargeability under this section, plaintiffs must show [7] both (1) that the defendant is guilty of injury to property and (2) that the injury to property was accomplished wilfully and maliciously.

In determining whether an injury to property has been committed, the standard is whether the defendants have committed an act against the plaintiffs' property rights which is actionable under the general law. The parties in the action at bar do not dispute the fact that it would constitute actionable copyright infringements for defendants to have continued playing the copyrighted musical compositions after termination of the franchise agreement in question.[8] The issue which the parties have presented to the court for determination is whether that infringement was willful and malicious so as to create a liability which is nondischargeable in bankruptcy.

"A claim founded on a mere technical conversion [or other injury to property] without conscious intent to violate the rights of another, and under mistake or misapprehension, is dischargeable." 3 Collier on Bankruptcy ¶ 523,16, p. 523–117 (15th ed. 1986). In determining whether an injury to property is willful and malicious within the meaning of section 523(a)(6), *supra*, a range of definitions has historically been employed. One definition of "willful and malicious" which is applied is the "legal malice" or "objective" definition. "[A] wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.... Thus, the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is a willful and malicious injury within the exception." 1A Collier on Bankruptcy ¶ 17.17, pp. 1652, 1653, 1654 (14th ed. 1976). See also to the same effect 3 Collier on Bankruptcy ¶ 523.16, pp. 523–111, 523–112 (15th ed. 1986). At the other end of the spectrum is the "actual malice" or "subjective" standard. "[W]hen a defendant has disposed of collateral without permission but with some notion, however erroneous it would appear to be, that he has a right to dispose of it, there can be no finding of willful and malicious conversion." *Matter of Lewis*, 17 B.R. 46, 48 (Bkrtcy.W.D.Ark.1981). "There must be an 'intent to do harm.'" *Matter of Nelson*, 10 B.R. 691, 692 (Bkrtcy.N.D.Ill.1981). Between these antipodes the decisions shifted even under the pre–1979 Bankruptcy Act. "A claim or judgment based merely upon negligence does not necessarily constitute a willful and malicious injury within the exception, even if the negligence is alleged to be reckless and wanton. The opposite result will be reached, of course, where the alleged negligence is founded upon a willful and malicious act. The cases shade

---

title. The estimate of damages to be made by the trial court must be "necessarily somewhat arbitrary." *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 232, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952). "If neither profits nor normal damages are ascertained, then ... the award of statutory 'in lieu' damages is mandatory, although the amount of such recovery remains discretionary." *Sid and Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1177 (9th Cir.1977). "The determination of statutory damages ... is left solely to the discretion of the trial court and review of the court's decision on this issue is 'extremely narrow.'" *Rare Blue Music, Inc. v. Guttadauro*, 616 F.Supp. 1528, 1530 (D.Mass.1985). Nevertheless, there must be an "adequate reference base" for the trial court's decision. See *Morley Music Co. v. Dick*

*Stacey's Plaza Motel, Inc.*, 725 F.2d 1, 3 (1st Cir.1983), to the following effect:

> "[A] trial court is not left completely to its own devices in determining damages. Although there need not be the kind of hearing required if factual damages were the issue, there must, we think, be either some hearing or sufficient affidavits to give the trial judge an adequate reference base for his judgment."

And, in this case, there is no record of any infringements, or any number thereof, after August 7, 1986.

7. By a preponderance of the evidence. See *Matter of Curl*, 49 B.R. 302, 304 n. 6 (Bkrtcy.W.D. Mo.1985).

8. See pages 941 and 942 of the text of this memorandum, *infra*.

imperceptively from one group to another." 1A Collier on Bankruptcy ¶ 17.17, pp. 1656, 1658, 1659 (14th ed. 1976). When the Bankruptcy Reform Act of 1978 came into effect on October 1, 1979, its explicit refusal to consider "reckless disregard" as a substitute for intention appeared to give early impetus to the subjective standard.[9] The pioneer cases under the new Code focussed on a frankly "subjective" definition [10] which refused to grant a decree of nondischargeability unless a definite "intent to harm" the secured creditor were shown.[11] If there was any ambiguity in the governing security agreement or the surrounding circumstances from which it could be inferred that the debtor had no "intent to harm" the secured creditor, then an innocent subjective intention was required to be inferred.[12] At length, some decisions rejected this standard and returned to the "legal malice" standard on the basis of a recognition that the "subjective" standards were in most imaginable cases impossible to meet. See, e.g., *United Bank of Southgate v. Nelson*, 35 B.R. 766, 773 (N.D.Ill.1983) ("In more recent case law, dissatisfaction with the [subjective] standard had led to a marked tendency by the courts to follow the intentional and deliberate definition of willful, but to strain to avoid what they view as the harsh and unfair results of the 'intent to do harm' definition of malice. In general these cases seek to circumvent the apparent Congressional intent to obviate

the [objective] standard and to apply the implied or constructive malice standard to the malicious requirement."); *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009, 1010 (4th Cir.1985) ("To require specific malice or some other strict standard of malice for nondischargeability of a debt under the Bankruptcy Code would undermine the purposes of that provision and place 'a nearly impossible burden' on a creditor who wishes to show that a debtor intended to do him harm ... To require such specific malice would restrict section 523(a)(6) to the small set of cases where the debtor was foolhardy enough to make some plainly malevolent utterance expressing his intent to injure his creditor ... Under the facts of this case, Vaughn acted toward St. Paul 'deliberately and intentionally in knowing disregard of the rights of another.' ").

In our circuit, the Court of Appeals has developed a cautious and fair middle-ground standard which tests whether the debtor's conduct was of a type which was, or should have been recognized to be, certain to cause harm to the secured creditor. "When transfers in breach of security agreements are in issue, we believe nondischargeability turns on whether the conduct is (1) headstrong and knowing ('willful') and (2) targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm." *In re Long*, 774 F.2d 875,

---

**9.** See House Report No. 95–595, 95th Cong., 1st Sess. 365 (1977), U.S.Code Cong. & Admin.News 1978, p. 6320 to the following effect: "Paragraph (6) (of session 523(a)) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, 'willful' means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a 'reckless disregard' standard, they are overruled."

**10.** "[T]he decisions have gone to the extreme of requiring proof of such an intention by means of a rigid subjective standard, under which the debtor's conversions are excused if he has a good faith, albeit unreasonable, belief that he has a right to deal with the property as his own." *Matter of Ireland*, 49 B.R. 269, 271 (Bkrtcy.W.D.Mo.1985).

**11.** "[M]alice must encompass 'an intent to harm' the creditor." *In re Hodges*, 4 B.R. 513, 516 (Bkrtcy.W.D.Va.1980). "When the injury is directly to a person or to the property of another, a standard of intentional harm is understandable ... But when the injury is conversion of secured property such a standard virtually renders the remedy meaningless. Under what circumstances, for instance, would a debtor ever sell secured property out of malice? ... Nevertheless, I believe the *Hodges* case correctly reads the intent of Congress, and this Court will follow it in the absence of a binding appellate decision to the contrary." *Matter of Nelson*, 10 B.R. 691, 692 (Bkrtcy.N.D.Ill.1981).

**12.** See, e.g., *Matter of Ireland*, 49 B.R. 269, 271 (Bkrtcy.W.D.Mo.1985).

881 (8th Cir.1985). Under this rule, a debtor is charged with knowledge of the natural consequences of his or her actions. "While intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent. Use of objective information to ascertain intent to cause harm is by no means unfamiliar." *In re Long, supra,* at 881, citing *Bogard v. Cook,* 586 F.2d 399, 412 (5th Cir.1978), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979), in which it is said: "we read the malicious intent prong ... to require proof that [a defendant] either actually intended to do harm to the plaintiff, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result." This court reads the *Long* decision, *supra,* to work a substantial alteration in the law whereby the former "subjective" standard is no longer followed and a more salutary rule is to be employed whereby the debtor is responsible for the natural effect of his or her actions.

■ Under the facts of this case, the court cannot say that the actions of the defendants, or either of them, in continuing to play the musical compositions, could qualify as "headstrong and knowing" and targeted at the creditor ... in the sense that the conduct "[was] certain or almost certain to cause financial harm" until the letter of August 7, 1986, was received and read. Only then were the defendants unequivocally advised that they should no longer play the compositions on their radio station. Prior to that time, according to the evidence, the admonitions given to the defendants by the plaintiffs were unclear as to whether the contract was actually terminated so that no further use of the compositions should be made. Up to and through the meeting of October 31, 1985, the statements made to defendants, according to the evidence, were simply to the effect that the defaults in payment should be cured. There was, through that time, no unambiguous directive to stop playing the compositions. But, with the unequivocal letter of August 7, 1986, Herbert G.

Remick had a duty no longer to play the compositions on the air. And his role in doing so thereafter can only be characterized as "headstrong and knowing" and "targeted at the creditor," within the meaning of *In re Long, supra.* This appears to be the rule ordinarily employed to determine "wilfulness" in the context of copyright infringement. See, e.g., *Nick–O–Val Music Co. v. P.O.S. Radio Inc.,* 656 F.Supp. 826, 829 (M.D.Fla.1986) ("Defendants knew ... that their ASCAP licenses had been revoked ... [and] deliberately ignored this knowledge ... and broadcast the copyrighted musical compositions without proper licensing or other valid permission.") *Music City Music v. Alfa Foods, Ltd.,* 616 F.Supp. 1001, 1003 (E.D.Va.1985) ("It is clear that defendant's actions were willful. Defendant was notified on numerous occasions both by letter and by visits from ASCAP representatives that it *was violating* the copyright laws." [Emphasis added]); *Broadcast Music, Inc. v. Niro's Palace, Inc.,* 619 F.Supp. 958, 963 (N.D.Ill. 1985) ("Niro's provided unauthorized performances of copyrighted musical compositions on its premises after receiving oral and written notices *of infringement* and demands to stop infringement from BMI. This behavior indicates a willful disregard of copyrights held by BMI ..."); *Nick–O– Val Music Co., Inc. v. P.O.S. Radio, Inc.,* 656 F.Supp. 826, 829 (M.D.Fla.1987) ("Defendants knew of their license fee delinquencies, *and knew or should have known that their ASCAP licenses had been revoked* ... Yet, Defendants deliberately ignored this knowledge ... and broadcast the copyrighted musical compositions without proper licensing or other valid permission. This uncontroverted evidence is sufficient to sustain a finding that Defendants acted willfully." [Emphasis added.]); *In re Gabaldon,* 55 B.R. 431, 432 (Bkrtcy.D.N. M.1985) ("Ignoring this correspondence *and demands to cease and desist* were intentional." [Emphasis added.]). In all these cases, as the above quotations indicate, there had been unambiguous demands to stop the broadcasting of the copyrighted compositions. And even if such a clear

"cease and desist" demand is not necessary to establish wilfulness under the copyright laws, § 504(c)(2), Title 17, United States Code, it *is* necessary to establish that the infringement is "willful" and "malicious" within the meaning of § 523(a)(6) of the Bankruptcy Code and *In re Long, supra.* There is no evidence that the debtors in this action undertook deliberately to refuse to gain knowledge of the loss of the license which occurred prior to May 16, 1986, as there was in *Wow and Flutter Music v. Len's Tom Jones Tavern, Inc.*, 606 F.Supp. 554 (W.D.N.Y.1985). Otherwise, the authorities under § 523(a)(6) of the Bankruptcy Code literally eschew the "reckless disregard" standard. See H.R. No. 95–595, 95th Cong. 1st Sess. 365 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6320, to the following effect:

> "Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person. Under this paragraph, 'willful' means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473[, 24 S.Ct. 505, 48 L.Ed. 754] (1902 [(1904)]), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a 'reckless disregard' standard, they are overruled."

■ Further, the evidence which has been presented is insufficient to demonstrate that the defendant Lesalie R. Remick had any knowledge of the unequivocal letter of August 7, 1986, or otherwise any knowledge that a clear directive had been issued to stop the playing of the compositions on the air. The plaintiffs contend that the court should draw an inference that she knew of such directives by reason of the fact, shown in the evidence, that she had conversations with her husband Herbert G. Remick frequently concerning business operations. But there is no evidence that those conversations ever focused upon the subject of the franchise agreement which comprises the subject matter at bar nor, if so, that they further focused upon any directives to stop playing the compositions. The inference which the court is requested to draw in this regard is simply too remote to warrant a fastening of liability upon the defendant Lesalie R. Remick under the rubric that her actions were "headstrong and knowing" and "targeted at the creditor." "[A]n inference is not reasonable if it is 'only a guess or a possibility.'" *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir.1983). Further, even if such an inference were permissible, the court, as trier of fact, elects not to draw it when the evidence, as recounted above, shows that there was only one unambiguous directive; that Mr. Remick only saw it; and that, even after that, as he testified before this court, he professed not to understand it as any more than an admonition to make up an arrearage in payments. While his testimony in this regard is not credible in light of the unambiguous letter of August 7, 1986, it nevertheless exists as some evidence of the likelihood that he would not have communicated to his wife his knowledge of the unambiguous directive. Plaintiffs go on to state that Ms. Remick was the bookkeeper for the radio station operation and should therefore have known that payments were not being made pursuant to the contract. According to the above analysis, her knowledge of nonpayment, without more, would not be sufficient to give her knowledge of the loss of the license which would make her actions willful and malicious under § 523(a)(6). This court therefore concludes that no nondischargeable liability can be imposed upon the defendant Lesalie R. Remick.

Finally, such infringement as was committed by the defendant Herbert G. Remick can be regarded as "willful and malicious" within the meaning of § 523(a)(6) only as it took place after the date of the unambiguous letter of August 7, 1986. As to this period of time, however, the evidence, does not provide a basis for the court's determining even an approximate magnitude of damages. It is patent that a court may not base an award of damages on sheer guesswork and speculation. It is true that the court must employ the statutory framework of damages in the absence of an actual showing thereof, but that statutory framework requires a showing of infringe-

ments after the date of the loss of the license and, as is relevant under § 523(a)(6) a showing of infringements after knowledge is gained thereof. The court finds no record of infringements after August 7, 1986, in the file. This court must therefore omit rendering a judgment in this case and accordingly limit itself to issuing a decree of nondischargeability with respect to all damages which accrued from the playing of the musical compositions after the date of the unambiguous letter, August 7, 1986. The plaintiffs may reduce the claim for such a magnitude of damages to judgment in another court of competent jurisdiction, see *Matter of Naughton,* 44 B.R. 670, 671 (Bkrtcy.W.D.Mo.1984); *Matter of Kakolewski,* 32 B.R. 494 (Bkrtcy.W.D.Mo.1983), or in this court.[13] For this purpose a hearing will be set.

For the foregoing reasons, it is hereby

ORDERED, ADJUDGED, AND DE-CREED that the indebtedness of defendant Herbert G. Remick to plaintiffs for playing musical compositions subject to plaintiffs' copyright after August 7, 1986, be, and it is hereby, declared to be nondischargeable in bankruptcy. It is further

ORDERED that a hearing be held on the damages issue on December 18, 1987, at 10:15 a.m. in the United States District Courtroom, 3rd and Joplin Streets, Joplin, Missouri.

FINAL JUDGMENT THAT PLAINTIFF HAVE AND RECOVER THE SUM OF $10,673.75 FROM THE DEFENDANT HERBERT G. REMICK AND THAT THAT LIABILITY BE REGARDED AS NONDISCHARGEABLE IN BANKRUPTCY

Formerly, on November 18, 1987, this court issued its decree of nondischargeability of a portion of the indebtedness of the defendant Herbert G. Remick to the plaintiffs. Specifically, it was determined "that the indebtedness of defendant Herbert G. Remick to plaintiffs for playing musical compositions subject to plaintiffs' copyright after August 7, 1986, ... is hereby declared to be nondischargeable in bankruptcy." Within the memorandum of findings of fact and conclusion of law supporting that decree, it was stated as follows with respect to the issue of damages:

"Plaintiffs, in the course of their briefing of the action at bar, advert to the principle that damages are presumed from any copyright infringement. But this principle cannot be sufficient, without some evidence, to permit the court to make a finding of *how much* in damages may be attributed to *willful* and *malicious* infringement. The court may, however, award damages which are totally statutory and totally discretionary. '[T]he district court is required to apply the mandatory statutory damage provi-

---

**13.** See *Matter of Naughton,* 44 B.R. 670, 671 (Bkrtcy.W.D.Mo.1984) to the following effect: "'A court of bankruptcy has an exclusive and nondelegable control over the administration of an estate in its possession. But the proper exercise of that control may, where the interests of the estate and the parties will best be served, lead the bankruptcy courts to consent to submission to State courts of particular controversies involving ... questions of State ... law and arising in the course of bankruptcy administration.' *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 483, 60 S.Ct. 628, 630, 84 L.Ed. 876 (1940). '[T]here is a limited discretion available to a bankruptcy court to require matters to be litigated in state courts even where jurisdiction exists in the bankruptcy court.' *In re Axton,* 641 F.2d 1262, 1273 (9th Cir.1981). Even when the action is a nondischargeability action conceived to be exclusively determinable by the bankruptcy court, it has been held that, if the same issues

have, as a matter of fact, been previously tried and determined in a state court, they bind the bankruptcy court's subsequent determination under principles of collateral estoppel. 'If, in the course of adjudicating a state-law question, a state court should determine factual issues using standards identical to those of section (523), then collateral estoppel, in the absence of a countervailing statutory policy would bar litigation of those issues in the bankruptcy court.' *Brown v. Felsen,* 442 U.S. 127, 139, n. 10, 99 S.Ct. 2205, 2213, n. 10, 60 L.Ed.2d 767 (1979). Or the bankruptcy court may determine the dischargeability issue on the basis of the state court record made on the issue of liability. *In re Mountjoy,* 368 F.Supp. 1087, 1096 (W.D.Mo.1973) ('Upon a judgment on the claim in the state court, the bankruptcy court can review the record, hear additional evidence if offered or desired, and then make a determination on the crucial issue of dischargeability.')."

sions where there is no evidence of the amount of damages.' *Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc.,* 367 F.2d 236, 241 (9th Cir.1966). That statutory scheme provides for $250 to $10,000 damages against each infringer per infringement 'as the court considers just,' § 504(c)(1), Title 17, United States Code, and additionally, when the infringement was willful, 'the court in its discretion may increase the award of statutory damages to a sum of not more than $50,000.' § 504(c)(2) of the same title. The estimate of damages to be made by the trial court must be 'necessarily somewhat arbitrary.' *F.W. Woolworth Co. v. Contemporary Arts,* 344 U.S. 228, 232 [73 S.Ct. 222, 225, 97 L.Ed. 276] (1952). 'If neither profits nor normal damages are ascertained, then ... the award of statutory "in lieu" damages is mandatory, although the amount of such recovery remains discretionary.' *Sid and Marty Krofft Television v. McDonald's Corp.,* 562 F.2d 1157, 1177 (9th Cir.1977). 'The determination of statutory damages ... is left solely to the discretion of the trial court and review of the court's decision on this issue is "extremely narrow." ' *Rare Blue Music, Inc. v. Guttadauro,* 616 F.Supp. 1528, 1530 (D.Mass.1985). Nevertheless, there must be an 'adequate reference base' for the trial court's decision. See *Morley Music Co. v. Dick Stacey's Plaza Motel, Inc.,* 725 F.2d 1, 3 (1st Cir.1983), to the following effect:

'[A] trial court is not left completely to its own devices in determining damages. Although there need not be the kind of hearing required if factual damages were the issue, there must, we think, be either some hearing or

sufficient affidavits to give the trial judge an adequate reference base for his judgment.'

And, in this case, there is no record of any infringements, or any number thereof, after August 7, 1986."

Therefore, this court, by means of its contemporaneous order, set a hearing for December 18, 1987, on the issue of damages. The plaintiffs moved for a continuance of the scheduled hearing, whereupon the court, on January 4, 1988, issued its order to submit proof of the date and number of infringements by affidavit. The affidavit which the plaintiffs submitted in compliance with that order purported to show that 16 infringements had taken place since August 7, 1986. They may be briefly diagrammed as follows:

| | | |
|---|---|---|
| Sept. 13, 1986 | 1 song | (repeat of 10/25/86 violation) |
| October 22, 1986 | 5 songs | |
| October 23, 1986 | 5 songs | |
| October 24, 1986 | 2 songs | |
| October 25, 1986 | 3 songs | |
| | 16 infringements | |

In filing his response to the plaintiffs' affidavit the defendant Herbert G. Remick does not deny the accuracy of that affidavit, but rather states that he is currently in poverty-stricken circumstances; that the infringements adverted to in the affidavit should be treated as a single continuing infringement; and that accordingly, damages should be limited to the minimum provided by statute, the sum of $250. The affidavit however, establishes that there were 16 separate infringements involving 14 different musical compositions.[1] The

1. The 16 separate infringements that involve 14 different musical compositions are as follows:

| | Song Title | Date of infringement |
|---|---|---|
| 1. | "Bewitched" | 09/13/86 |
| 2. | ("I'm in heaven when I see you smile) Diane | 10/22/86 |
| 3. | "Open a new window" | 10/22/86 |
| 4. | "Moonglow" | 10/22/86 |
| 5. | "Love is here to stay" | 10/22/86 |
| 6. | "A Taste of Honey" | 10/22/86 |

governing authorities hold that a minimum of $250 must be awarded for each such infringement of a separate composition.[2] Thus, the basic award must be that number times $250, or $3,500.00. This court is persuaded by the defendant's protestations of poverty to keep the award at a minimum. The initial and supplemental affidavits of the plaintiffs additionally establish the legitimate expenditure by plaintiffs on this action of $7,173.75 in attorneys' fees and expenses. This amount must therefore be added to the above and foregoing minimum award to establish the appropriate amount of damages. It is therefore accordingly hereby

ADJUDGED that the plaintiffs have and recover from the defendant Herbert G. Remick the sum of $10,673.75 and that, in accordance with the court's decree of November 18, 1987, that liability be regarded as nondischargeable in bankruptcy.

|  | Song Title | Date of infringement |
|---|---|---|
| 7. | "Love is here to stay" (Repeat of 10/22/86 infringement) | 10/23/86 |
| 8. | "My Romance" | 10/23/86 |
| 9. | "Midnight Cowboy" | 10/23/86 |
| 10. | "Limelight Theme" | 10/23/86 |
| 11. | "The Waltz you saved for me" | 10/23/86 |
| 12. | "Roses are red (my love)" | 10/24/86 |
| 13. | "It all depends on you" | 10/24/86 |
| 14. | "I'll walk alone" | 10/25/86 |
| 15. | "Bewitched" (Repeat of 9/13/86 infringement) | 10/25/86 |
| 16. | "Three Coins in the Fountain" | 10/25/86 |

2. See H.R. No. 1476, 94th Cong., 2d Sess. (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5778, reprinted in 17 U.S.C. § 504 at 607, to the following effect:

"Where the [copyright enforcement] suit involves infringement of more than one separate and independent work, minimum statutory damages for each work must be awarded. For example, if one defendant has infringed three copyrighted works, the copyright owner is entitled to statutory damages of at least $750 and may be awarded up to $30,000 [$150,000 for willful violations]."

